UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GALEN INSTITUTE, LLC ET AL.       :      DOCKET NO. 3:02CV1232-(PCD)

v.                                :

COMTA ET AL.                      :      JUNE 8, 2005

<u>TRIAL MEMORANDUM</u>

The plaintiff Galen Institute, LLC in the above-entitled action hereby submits, pursuant to D. Conn. L. Civ. Rule 16(e), the following trial memorandum.

I.    <u>FACTS</u>

Galen Institute, LLC (hereinafter referred to as "Galen") is a limited liability company established under the laws of the state of Connecticut in 1997 for the purpose of conducting an occupational school of massage therapy. Galen became authorized by the state of Connecticut Department of Higher Education (hereinafter referred to as "DHE") in February, 1998.  Galen commenced offering instruction in medical massage therapy in June, 1999.

In order to practice massage therapy in Connecticut, graduates of Galen and any other occupational school of massage therapy, in

addition to meeting several other legal requirements, must graduate

from a school of massage therapy which complies with C.G.S. section

20-206b. Subsection (a) thereof provides

>        [n]o person shall engage in the practice of
>        massage therapy unless the person has obtained
>        a license from the department pursuant to this
>        section. Each person seeking licensure as a
>        massage therapist shall make application on
>        forms prescribed by the department, pay an
>        application fee of three hundred dollars and
>        present to the department satisfactory evidence
>        that the applicant: (1) Has graduated from a school
>        of massage therapy offering a course of study of
>        not less than five hundred classroom hours, with
>        the instructor present, and, at the time of the
>        applicant's graduation, was either (A) accredited by
>        an agency recognized by the United States Department
>        of Education or by a state board of post-secondary
>        technical trade and business schools, or (B) accred-
>        ited by the Commission on Massage Therapy Accredita-
>        tion, and (2) has passed the National Certification
>        Examination for Therapeutic Massage and Bodywork.
>        Passing scores on the examination shall be prescribed
>        by the department.

The "department" referenced in the first two sentences of section 20-

206b(a) is the Connecticut Department of Public Health (hereinafter

referred to as the "DPH").

There is a savings provision set forth in C.G.S. section 20-

206b(c) for schools not so accredited pursuant to the requirements of

subsection (a) at such time as their graduates apply for Connecticut

licensure.   Subsection (c) permits the DPH to

> issue a license to an applicant whose school of
> massage therapy does not satisfy the requirement
> of subparagraph (A) or (B) of subdivision (4) of
> said subsection [section 20-206b(a)], provided the
> school held, at the time of the applicant's graduation,
> a certificate issued by the Commissioner of Education
> pursuant to section 10-7b and provided the applicant
> graduated within thirty-three months of the date said
> school first offered the curriculum completed by the
> applicant.  No license shall be issued under this
> subsection to a graduate of a school that fails to
> apply for and obtain accreditation by (1) an
> accrediting agency recognized by the United States
> Department of Education or (2) the Commission on
> Massage Therapy Accreditation within thirty-three
> months of the date said school first offered the
> curriculum.

C.G.S. section 10-7b, as referenced in section 20-206b(c), has been

transferred to C.G.S. section 10a-22b, which statute sets out the

basic criteria required of a massage therapy school for initial

authorization and re-authorization.

DPH has held by its declaratory ruling dated June 28, 2004 that

accreditation by "a state board of post-secondary technical trade and

business schools," as set forth in C.G.S. section 20-206b(a), is

inapplicable to the DHE because the DHE does not accredit

occupational schools, but, rather, authorizes them pursuant to the provisions of C.G.S. sections 10a-22b et seq.  The court, pursuant to Federal Rule of Evidence 201, may take judicial notice of this declaratory ruling.

James J. Lattanzio, Jr. (hereinafter referred to as "Lattanzio"), cognizant of the aforementioned statutory temporal limitation, undertook the accreditation planning process on behalf of Galen in early 1999.

The defendant Commission on Massage Therapy Accreditation (hereinafter referred to as "COMTA") solicited Lattanzio.  He elected to proceed with COMTA in his quest for accreditation partly on the fact that COMTA was named (or lobbied to have itself named) expressly in section 20-206b(a).

The pre-accreditation materials forwarded to Lattanzio by COMTA required a school to be in operation for at least two years, and to have graduated at least twenty persons from its longest educational program (regardless of whether such program was the subject of an application for accreditation), prior to applying for accreditation. See plaintiffs' Exhibit 2.  Lattanzio testified that Galen had opened

a Stamford branch campus in 2001, which campus commenced an eighteen month, one thousand hour New York medical massage therapy course of study in 2001. At least twenty persons graduated from such New York program in 2001.

Lattanzio attended COMTA's mandatory pre-accreditation workshop, in Evanston, Illinios, in March, 2001. There the defendant Carole A. Ostendorf (hereinafter referred to as "Ostendorf") provided Lattanzio with the most recent COMTA standards, COMTA's written policies and procedures, application forms and instructions for the application. See plaintiffs' Exhibit 2. At this workshop Ostendorf acknowledged the existence of the thirty-three month accreditation deadline and assured Lattanzio that COMTA could accomplish within such period such accreditation.

Lattanzio returned to Galen after said pre-accreditation workshop and began immediately undertaking the laborious effort of answering essentially forty-seven standards issued by the defendant COMTA, almost all of which were applicable to Galen. The narrative answers to these standards, along with the hundreds of pages of documents verifying Galen's compliance, or adoption of a policy

consistent, with these standards, formed the self-study reports which
COMTA was required to review.  Lattanzio forwarded to COMTA these
self-study reports (hereinafter referred to as "SSRs") on October 1,
2001, seven months after the pre-accreditation workshop.  Lattanzio
forwarded revised portions of SSRs, upon request of COMTA, in
December, 2001 and January, 2002.  See plaintiffs' Exhibits 11, 12,
15 and 16.

Ostendorf delayed without explanation the scheduling of the
onsite visit, the next step in the process, until March 25, 2002.
COMTA's printed steps in the initial or renewal of accreditation,
admitted as plaintiffs' Exhibit 2, specifies that "COMTA reviews SSR
and makes recommendation: 1. Revision is needed; 2. Applicant is
insufficiently prepared for onsite visit; or 3. Applicant is prepared
for onsite visit."  COMTA suggested or required two revisions to
Galen's SSRs, with which suggestions or requirements Galen complied
expeditiously in December, 2001 and January, 2002.  When COMTA
scheduled the onsite visit for March 25, 2002, it can be reasonably
inferred therefrom that the "[a]pplicant is prepared for [the] onsite
visit."  Nowhere in COMTA's written policies and procedures is there

any provision permitting a school to insist upon a premature onsite visit.  Goss' and Ostendorf's testimony to the extent that they permit same implies an arbitrary imposition of this policy.

COMTA sent its own executive director, Ostendorf, as the leader of the onsite visit team.  COMTA also sent Brenda Griffith, Dee Meux and Michelle Minch as members of the onsite team.  Griffith was the education specialist, while Minch was the practitioner, and Meux was the management/finance specialist.

Appendix E, pages 3-4, of the COMTA written policies, admitted as plaintiffs' Exhibit 2, sets out the required qualifications of the team members.  Prominent among these mandatory qualifications were: "B. [c]urrent or recent involvement in training program or other experiences relevant to the responsibilities of the specific role on the onsite team. C. [f]amiliarity with accreditation standards and understanding of the criteria needed to comply with those standards." This same exhibit, on page 4, requires the team leader to possess certain qualifications, notably "D. [r]esponsible for interactions between team and school personnel and students during the visit."

Ostendorf acknowledged that Meux had no accounting and financial education or background.  Meux was charged with the responsibility of reviewing the financial aspects of Galen, "with knowledge of administration, business and finances."  Meux had primary oversight of standards 8 (management) and 9 (financial practices).

The COMTA onsite inspection team conducted its visit at the Galen Wethersfield facility March 25-26, 2002.  Although it is unclear exactly who authored the onsite inspection report (the defendants' evidence is conflicting: Brenda Griffith said she authored the commentary to Standards 3, 5 and 7, while Ostendorf stated that she – Ostendorf – typed the commentary to those standards), an onsite inspection report was issued to Galen on or about April 1, 2002.  The entire inspection report is admitted as plaintiffs' Exhibit 18.  Most of the ratings on most of the standards were either 1 or 2.

Galen, dissatisfied with the onsite inspection processes and results, responded thereto in writing on May 19, 2002 (plaintiffs' Exhibit 19).  Galen followed that correspondence with its letter, dated May 21, 2002, withdrawing from the accreditation process

(plaintiffs' Exhibit 20).  Shortly thereafter, on June 4, 2002, Galen demanded a refund of all monies theretofore paid in connection with the accreditation process, and the return of its materials (plaintiffs' Exhibit 21).

By its correspondence of June 4, 2002 and June 18, 2002 COMTA refused to acknowledge Galen's attempted withdrawal, and demanded payment of an alleged balance owed in connection with the onsite inspection (plaintiffs' Exhibit 22).  In said correspondence Ostendorf interpreted COMTA'S written policies as precluding withdrawal subsequent to the onsite inspection.

Perceiving the prospect of resolution as bleak, Galen commenced the subject action in July, 2002.  After COMTA failed to waive service of process, Robert Armstrong, representing himself as counsel to the American Massage Therapy Association (hereinafter referred to as "AMTA") offered Lattanzio a full refund and return of the material in consideration of withdrawal of the action.  Ostendorf testified that COMTA would not permit such withdrawal.

On November 4, 2002 COMTA deferred Galen's application, opining that with a "reasonable amount of work," and with no further onsite

inspection necessary, Galen could achieve accreditation (plaintiffs'
Exhibit 23).  With no further activity in the interim, COMTA issued
its letter of denial on May 5, 2003 (plaintiffs' Exhibit 23).

COMTA issued and delivered to Galen its set of written policies
(plaintiffs' Exhibit 2).  These policies included appendix E
concerning the onsite visit process (plaintiffs' Exhibit 2) and form
3 to appendix D concerning the required items in a school enrollment
agreement (plaintiffs' Exhibit 2).  These policies applied to
applicant schools.  These policies as applied, with equal force, to
COMTA, as acknowledged by Ostendorf on cross-examination on May 16,
2005.

Paragraph 6 of the Introduction in said policy (plaintiffs'
Exhibit 2) recites that "[a]ccreditation is a voluntary process
dependent on high standards of integrity… [b]reaches in integrity
invalidate the process and the program or institution's status."
Although COMTA probably intended this policy to apply principally to
applicant schools, by Ostendorf's own admission, and applying common
sense and reason, such policy also should apply to COMTA.

COMTA violated its own written policies in the following manner:

10

1.  COMTA's written policy, page 4, section V, entitled Scope of Accreditation (plaintiffs' Exhibit 2) states "[n]ational and/or state (or provincial) law will prevail when either or both are in conflict with COMTA standards, policies, procedures, guidelines or decisions." COMTA violated this policy by failing to accredit, or making it even possible to accredit, Galen within the thirty-three month deadline mandated by C.G.S. section 20-206b(a).  COMTA, as a specifically named entity in said statute, was well aware of this deadline.  Yet COMTA delayed the onsite inspection to March 25, 2002, seven days prior to the month its commissioners were next scheduled to meet and consider applications for accreditation.  This delay rendered it virtually impossible for Galen to remedy any problems prior to the April meeting.

COMTA further violated this policy in that it failed to compare every one of the forty-six standards to applicable state law to determine which criterion- the standard or relevant state law- was more stringent.  This lapse was particularly poignant regarding Standard 9.1, concerning financial practices.  Of the nine criteria in Standard 9.1 applicable to Galen, only one received a mark of

"yes," indicating verification of this criteria by the onsite team, particularly Dee Meux, charged with oversight of Standard 9. The remaining eight criteria were purportedly unable to be verified. However, the onsite team was provided with all of Galen's financial statements, which were current and had been approved by the DHE. COMTA's standards pertaining to financial statements were less exacting than those of the DHE. COMTA's written policies, again contained within plaintiffs' Exhibit 2, states that, with respect to Standard 9.0 (Financial Practices), the applicant school must submit "[a] copy of your audit demonstrates this record or a reviewed financial statement and evidence of continued compliance with state educational financial requirements." The record referenced in the preceding sentence is "record of income and reserves... sufficient to complete the instruction of currently enrolled students and to maintain a program consistent with the standards." See page 49 of these same requirements set forth in plaintiffs' Exhibit 2. Galen submitted "reviewed financial statements." The evidence also demonstrated that Galen was in compliance with DHE financial requirements; thus, Galen should have been found to have met this

Standard 9.0.  It is a mystery how COMTA could have access to all of Galen's DHE approved financial statements, and still fail to verify that the income is sufficient, the current ratio is at least 1:1, a budget or financial system exists, and income and expense are within 25% of projections in major budget categories (which budgets, incidentally, COMTA failed to verify in another standard).

    2.  COMTA's written policy, page 1, paragraph 7, numbered subparagraph 2, in section I, entitled Introduction (plaintiffs' Exhibit 2) proclaims that it "sends a team of educational, administrative and financial experts to the school to verify the self-study."  COMTA violated this policy by sending three unqualified team members.  Dee Neux, the "management specialist," according to page 1 of the onsite inspection report (plaintiffs' Exhibit 18), had no formal financial education or training.  She was not a certified public accountant or certified financial analyst.  Ostendorf stated that she had some three years of experience in management at a massage therapy school.  However, the plaintiffs cannot perceive how simply being involved in management at a school, and for only three years at that, qualifies one to analyze "audited financial report[s]"

to verify that there exists "sufficient income to complete instruction of currently enrolled students and maintain standards" or to verify that the "current ratio is at least 1:1." See page 40 of plaintiffs' Exhibit 18. It seems to the plaintiffs that financial matters of this significance are far too important to be left to someone, represented by COMTA to be an "expert," who simply has three years' experience in unspecified management activities at a school. The fact that Ostendorf, holder of an M.B.A. degree, was present provides scant assurance. Ostendorf has no experience in analyzing financial statements.

COMTA sent Brenda Griffith as the ostensible "education specialist." Griffith had, according to Ostendorf, three to four years of massage therapy teaching experience at the time of the onsite inspection. She demonstrated no experience in teaching kinesiology, anatomy and physiology, or any of the other subjects covered at Galen. She did not graduate from a school accredited by a nationally recognized accrediting agency. Griffith had no training from COMTA in memory recall, report writing or note taking, all areas in which COMTA promises quality and the provision of training. See

14

appendix E, page 4, item 1.G (plaintiffs' Exhibit 2).  Furthermore,

Griffith had only two years of teaching experience at the time of the

onsite inspection.  She testified she had five years of teaching

experience, leaving, by the mathematical process of subtraction, that

she had only two years of experience at the time of the inspection.

Still further, Griffith does not possess a post-secondary degree in

the sciences.  COMTA requires faculty at an accredited institution to

possess a post-secondary degree (see Standard 4.1.4, page 19 of

plaintiffs' Exhibit 18).  Yet, COMTA engaged as a team member a

person such as Griffith who, herself, would not have qualified under

COMTA's own standards as an appropriate faculty member.  Still

further, Griffith testified that she last received COMTA training, at

which she would have become familiar with COMTA policies and

standards, at the workshop in 1998 or 1999.  Ostendorf testified that

the COMTA policies and standards were amended in 2000.  Griffith did

not remember specifically if she had read the COMTA policies and

standards prior to the onsite visit.  Thus, Griffith was untrained in

the COMTA policies and standards in effect as of the onsite

inspection.

Ostendorf testified that Michelle Minch, the apparent administrative specialist, currently teaches at an unaccredited school, and has no formal medical massage therapy training.

Galen submits that, like Meux, neither Griffith nor Minch were qualified as experts to handle the sensitive and significant task of evaluating a medical massage therapy program.  COMTA had promised a team of "experts," and sent instead a melange of weak, untrained amateurs.

3.  COMTA's written policy is to assist the applicant in achieving accreditation.  Ostendorf admitted such.  COMTA violated such policy by failing to make suggestions to Galen as to how to comply with the standards.  Plaintiffs' Exhibit 18, the April 1, 2002 onsite inspection report, contains no discussion aimed at assisting Galen with the accreditation standard compliance.  Furthermore, none of COMTA's June 14, 2002, June 18, 2002, November 4, 2002 and May 5, 2003 correspondence (all part of plaintiffs' Exhibits 22 and 23) contain any discussion recommending any steps Galen can pursue in achieving compliance.  The latter two items of correspondence simply reiterate the findings of the April 1, 2002 onsite inspection report

and a list of the standards the subject of alleged non-verification by the onsite inspection team.  COMTA's own officials are even divided as to the policy: Ostendorf acknowledged that COMTA subscribes to such policy, while John Goss denied the existence of such a policy, asserting that the only requirement of COMTA is to set out the standard, and it is up to the school to comply on its own, or adopt a policy that does comply with such standards.  The onsite team apparently was unaware of the Goss interpretation of the aforesaid COMTA policy.

4.   COMTA possesses a policy of refraining from conflicts of interest, as expatiated in Appendix B, pages 4-5 (plaintiffs' Exhibit 2).  However, Lattanzio testified that on November 6, 2003 he was deposed by defense counsel in this subject action, during which deposition he testified about how Galen was, at that time, currently conducting its business and how Galen graduates were being licensed by the DPH.  Significantly, on November 26, 2003 Linda Derick, as an "interested person," and former COMTA commissioner in 2001, filed with the DPH a request for declaratory ruling, requesting essentially the DPH to interpret C.G.S. section 20-206b in a fashion inimical to

Galen's status as a then non-accredited entity.  Derick, at the time

of filing the petition, was the executive director of CCMT, Galen's

chief competitor.  The plaintiffs submit that these two events are

not the result of mere coincidence, but circumstantial evidence

suggesting that COMTA communicates regularly with CMT.  The

plaintiffs submit that the factfinder can infer from these facts

that, upon learning of Galen's status and continued success licensing

its graduates, despite its non-accreditation, COMTA's counsel

notified the COMTA home office in Illinois of same, who thereupon

notified CCMT, who in turn sponsored the Derick petition aimed

essentially at driving Galen out of business.

Ostendorf also acknowledged that Stephen Kitts, owner of CCMT,

was present at COMTA federal recognition hearing in Washington,

D.C. in December, 2001 and communicated with the witness.  Although

she minimized the extent of Kitts' involvement in the defendant's

recognition efforts, the plaintiffs believe that a factfinder may

infer from the aforementioned events that there occurred

inappropriate communication between COMTA and CCMT during the

pendency of Galen's application for accreditation.

5.   COMTA possesses a policy permitting the appeal of adverse actions.  See COMTA's written policies, pages 9-10, section V (Appeals Process) (plaintiffs' Exhibits 2 and 3), wherein is set forth the appeals process following "denial of accreditation or revocation of accreditation."

COMTA makes much of Galen's failure to appeal the decision. COMTA deferred Galen's application in its November 4, 2002 correspondence to Galen (plaintiffs' Exhibit 23). COMTA's written policies, page 8 (plaintiffs' Exhibit 2), section III (Commission Actions), concerning the issue of deferral of accreditation, states that "[d]eferral is not considered to be an accreditation action." Section V of said policies, on page 9, does not permit appeal of deferral.

Lattanzio testified that any appeal beyond April, 2002 would have been fruitless, as the thirty-three month mandatory period would have expired thereafter.

COMTA violated its own policies by insisting that Galen appeal a non-appealable decision.

6.  COMTA possesses a policy relating to the withdrawal of an application for accreditation.  COMTA's written policies (plaintiffs' Exhibit 2), page 6, numbered paragraph 6 (part of section II) states that "[a]ctions available to applicant and accredited institutions/programs include appeal of adverse actions, withdrawal of application, or surrender of accredited status."  Obviously, this numbered paragraph 6 applies to applicants in the post-onsite inspection phase of the accreditation process, for it describes the actions available to COMTA, all of which can be undertaken only after the onsite visit.  This provision contradicts the provisions set forth on page 9, third full paragraph under section IV (Institution/Program Options) of this same written policy.  The latter clause permits an applicant to withdraw from the accreditation process only prior to the onsite visit.

Gale withdrew from the accreditation process on May 21, 2002 via written correspondence (plaintiffs' Exhibit 20).  COMTA, in denying such requested withdrawal by its correspondence dated June 4, 2002 and June 18, 2002 (plaintiffs' Exhibit 21), violated the plain

20

language of its written policy enunciated on page 6, numbered paragraph 6.

7.  COMTA possesses a policy mandating that applicant institutions must be legally organized.  Specifically, on page 5 of its written policy (plaintiffs' Exhibit 2), section I (Eligibility Criteria), numbered paragraph 3 under the heading entitled "Institutional Accreditation," COMTA requires that "[t]he institution must be legally organized…"  Certainly, the evidence established that Galen was so organized at all times during the accreditation process. During the trial the defendant COMTA admitted that it was not legally organized.

Ostendorf admitted during cross-examination that these same aforementioned written policies apply with equal force to COMTA. COMTA, by its own in-court admission on May 3, 2005, is a fictitious non-entity.  Lattanzio testified that COMTA never registered its trade name in Wethersfield or any other town, or in the Connecticut Secretary of State's office, and further failed to obtain a license to transact business in Connecticut.  COMTA clearly transacted business in this state.  COMTA violated its own policy by failing to

be "legally organized."  Appendix E of COMTA's written policy, page
3, numbered paragraph 5 specifies that "[a] failure to report
honestly, in and of itself, constitutes a breach of integrity.  This
includes: a. Presentation of false information, b. Omission of
essential information, c. Distortion of information with the intent
to mislead…"  COMTA's failure to disclose accurately to Galen the
facts that it (1) was an unincorporated accrediting arm of AMTA, (2)
was not registered by name in Connecticut, and (3) was not licensed
as a foreign entity to transact business in Connecticut, is in
violation of the policy, binding on COMTA pursuant to Ostendorf's
acknowledgment, mandating the honest reporting of information.  At
the very least, COMTA omitted or withheld from Galen essential
information relating to COMTA's status, or perhaps distorted this
information.

    8.  COMTA possesses a policy to consider only written complaints
concerning applicant schools.  Form 13a of Appendix D of COMTA's
written policy (plaintiffs' Exhibit 2) contains, inter alia, the
following criteria governing student complaints against schools: (1)

the names of the individuals involved, and (2) "all complaints shall be signed and provide a return address and telephone number."

Ostendorf testified that she inquired of and considered several complaints asserted against Galen by then-current or former students. Ostendorf admitted that all but the Elena Slesinski complaint were anonymous.  Ostendorf stated that she was concerned about these complaints.  These complaints may have played a role in the eventual accreditation action of COMTA.  See the Commentary to Standard 8.4 of the onsite inspection report, wherein the team reports "numerous complaints by students and former faculty and alleged verbal abuse by owner and school director."  COMTA violated its own written policy by considering anonymous complaints.  Furthermore, since state regulations require all complaints to be written, COMTA further violated its policy of complying with more stringent state law as enunciated in section V on page 4 of its written policy (plaintiffs' Exhibits 2 and 3).

9.  COMTA promises the highest level of integrity and strict confidentiality.  On page 1, in the third paragraph of section I (Introduction) of its written policy (plaintiffs' Exhibit 2), COMTA

"assures the highest level of integrity…"  COMTA commissioner Goss
testified that COMTA maintains the highest level of confidentiality,
and does not disseminate school materials and any information
concerning an applicant school to any third parties, including
federal and state governmental entities.  COMTA violated its own
policy in that it (1) forwarded copies of Galen's SSRs and supporting
exhibits to onsite team members prior to their execution of
confidentiality agreements; and (2) faxed a copy of the April 1, 2002
onsite inspection report and Galen's response to Patricia Santoro of
the DHE on May 21, 2002.

   10. COMTA, according to Ostendorf and Goss, evaluates applicant
schools through the initial screening and recommendation of two of
its commissioners, to whom are assigned such process by the
commission.  The two commissioners then recommend to the full
commission at its April or October meeting the action the
commissioners believe the commission should take with respect to that
school's application.  Thus, the apparent policy of COMTA is that the
full commission renders the decision.  Goss also stated that the
entire onsite team assesses the ratings for each standard.  However,

Griffith, a team member at the Galen onsite inspection and COMTA
agent, stated that she herself assessed the ratings for each standard
over which she had primary responsibility, specifically, in the
instant action, Standards 3, 5 and 7.  Although Griffith remarked
that other team members discuss and comment on such ratings,
invariably the final ratings assessed are those made by the team
member enjoying primary oversight over the subject standards.  This
implies that, contrary to Ostendorf's and Goss' interpretations, the
deliberation is not a team process, but, rather, a decision placed
primarily in the hands of one team member.  Griffith's testimony also
impliedly contradicts Goss' assertion that the full commission
renders the accreditation.  This is so because Goss averred that if a
school receives at least one negative verification with respect to
any criterion contained within a standard or substandard, the school
can never receive a rating of 3 or 4 for that standard.  In such a
situation, the applicant school cannot be granted accreditation,
because the definition of "accreditation," appearing on page 7 of the
COMTA written policy (plaintiffs' Exhibit 2), is "[c]onfirmation that
a program or institution meets or exceeds the accreditation

standards."  Thus, according to Griffith, a logical extrapolation of this situation is that the individual team members, contrary to COMTA's written policy, hold the key to accreditation.  The veracity and accuracy of this entire accreditation imbroglio is rendered even more suspect by Ostendorf's testimony, contradicting Goss, when she asseverated that it is possible for an applicant school to receive a negative verification respecting a criterion, and still receive a rating of 3 (which is defined as "meets the standard;" page 1 of the April 1, 2002 onsite inspection report for the standard or substandard of which such criterion forms a part.

In light of the foregoing ambiguities, COMTA, Galen contends, violated its own policy by failing to apply a uniform, consistent evaluation approach.

11. COMTA professes to assure, on page 1, paragraph 3 of its written policy, the highest level of integrity.  COMTA observes, on page 1, program conduct item 5 of its Appendix E, that "a failure to report honestly… constitutes a breach of integrity."  These policies, according to Ostendorf, its executive director, are binding upon COMTA as well as applicant schools.  COMTA violated these policies by

including many inherent inconsistencies in the onsite inspection report (plaintiffs' Exhibit 18).  Since both of the inconsistent statements cannot be true, one must be false, thereby constituting the "presentation of false information."  See Appendix 2, page 3, paragraph 5.  The inherent inconsistencies include the following:

a.  In Standard 2.2, on page 4, the onsite inspection team was unable to verify the existence of "course outlines, syllabi."  Galen received an "x" in the "no" column for that criterion, indicating that the team was unable to verify the existence of such course outlines and syllabi.  Yet the second full paragraph of the commentary, in the right-most column on page 4 states "In reviewing curriculum and course outlines…"  Either the team found course outlines, or they did not.

b.  Standard 2.8, on page 10, applies to "Institutions that measure their programs in credit hours…"  Despite evidence that Galen measures its programs using clock hours, the COMTA team forged ahead and assessed Galen a rating of 1 for Standard 2.8.

c.  In Standard 2.9, on page 11, there appears a criterion described thus:  "Curriculum conforms to all state licensing

requirements for which it claims to prepare students." The team placed an "x" in the "no" column. Yet the first paragraph of pertinent commentary recites "Curriculum conforms to local and state licensing requirement in CT." Either the curriculum did or did not comply with state law.

d.  In Standard 3.0, on page 15, the verification column contains a representation that there were five faculty, and thirty student, interviews. The column says "Interviews: Faculty 5, Students-30." Brenda Griffith had primary responsibility over Standard 3. Griffith testified that she spoke to only two faculty members. Griffith also said she reviewed student questionnaires but never directly interviewed any students. This testimony squarely contradicts the verification reported in Standard 3.0.

e.  In Standard 3.2, on page 16, the team placed an "x" in the "yes" column alongside the criteria entitled "Course outlines exist" and "Syllabi exist." Yet in Standard 2.2 on page 4 the team denied or failed to verify the existence of course outlines or syllabi.

f.  Standard 4.3, on page 23, contains a criterion labeled "Orientation procedures exist." The team placed an "x" in the "no"

column.  The first paragraph of the applicable commentary states "Faculty comment that their orientation included a tour by the director, they were given a key, textbooks and course materials."  In no way does this commentary even remotely suggest in just what manner was Galen's orientation deficient, or how it varied from its or COMTA's own standards, thereby rendering this assessment arbitrary and capricious.  Said commentary prima facie implies that Galen did indeed possess an orientation procedure.

g.  In Standard 5.2, on page 27, there is a criterion regarding the minimum entrance requirement at Galen.  The team verified that all students were beyond the age of compulsory attendance and had a high school diploma or equivalent.  Yet on page 26 the team failed to verify that "[a]ll students have met admissions requirements."  Furthermore, at the top of page 26 the team noted that its verification of this standard consisted of the review of thirteen student records.  This assertion conflicts with the testimony of Griffith, who recalled that she reviewed at least twenty student files.  Griffith wrote the commentary to Standard 5.2, including the notation that thirteen student files were reviewed.

h.   The last paragraph of the commentary to Standard 5.5, on page 29, laments that "…the time of classes scheduled and the start and end dates for classes are not identified."  A cursory review of Form 3, COMTA's catalog checklist (plaintiffs' Exhibit 2) reveals that nothing within that form requires the publication of the "start and end dates for classes."  This constitutes yet another conflict between what COMTA disseminates in its own written policies and standards, and what it found (or perhaps failed to find).

i.   In the second full paragraph of commentary to Standard 6.2, on page 32, the team remarked that "[i]n reviewing syllabi and learning objectives…"  Again in Standard 2.2 on page 4 the team failed to verify the existence of the syllabi.  Either Galen had syllabi or it did not.

j.   In Standard 6.3, also on page 32, the team entered an "x" in the "no" column for the first two criteria: whether performance standards are clearly stated, and are understood by students.  Judging Galen by whether its students understand the performance standards is arbitrary and capricious; Galen has no control over the extent of its students' understanding of the grading criteria.

Similarly, in the third and fifth criteria in Standard 7.2, on page 34, the team penalized Galen for failing to verify that (1) graduates were satisfactorily employed, and (2) graduates' expectations were consistent with the school's promotional materials. Both of these criteria concern matters over which Galen has little or no control, and the consideration of same by COMTA strikes the plaintiffs as arbitrary and capricious. Furthermore, the verification process is flawed. The verification column recites that interviews were conducted with "faculty, students, graduates, employers." Brenda Griffith, who had primary responsibility for Standard 7.2, testified that she reviewed student and graduate questionnaires, but never directly interviewed any of them. Griffith recalled speaking to only two faculty members; failed to recall to which, if any, staff members she spoke; yet asserted that she spoke to many people during the onsite visit. Of concern also is the direct conflict between Griffith's and Ostendorf's recollection of what transpired during the onsite visit: (1) Griffith said she typed the commentary in Standards 3, 5 and 7, while Ostendorf claimed she did; and (2) Griffith said she did not call any graduates and employers during the onsite visit,

31

while Ostendorf insisted that Griffith did call graduates and employers during the onsite visit.

    k.  In Standard 8.5, on page 39, the team placed an "x" in the "no" column for the criterion labeled "Job descriptions are understood."  Yet the pertinent commentary to Standard 8.5 notes, in contrast to the aforesaid assessment, that "[e]mployee interviews indicate a sense of job understanding…"

    l.  Regarding Standard 3, Griffith testified that the facility was inaccessible to wheelchairs.  DiStanzio affirmed that that the facility was so accessible.  Plaintiffs' Exhibit 12, the SSR appendix, contains a scaled floor plan, which depicts all exterior doors as being thirty-six inches wide, sufficient to accommodate a wheelchair.  The main building and Galen entrance doors are seventy-two inches wide, according to said scaled plan, which also are wide enough to accommodate wheelchairs.  Griffith either failed to review this scaled plan, failed to measure the door widths to verify the depictions on this scaled plan, or both.  In any event, this failure of verification constituted a transgression of COMTA's policy to use

the onsite visit as a mechanism to verify the SSRs and supporting
exhibits.

II.   DISCUSSION OF APPLICABLE LEGAL PRINCIPLES

A.  FEDERAL COURTS HAVE EXCLUSIVE JURISDICTION OVER CLAIMS AGAINST
FEDERALLY RECOGNIZED ACCREDITATION AGENCIES.

     Federal courts have exclusive subject matter jurisdiction over
controversies involving federally recognized accreditation agencies.
20 U.S.C. section 1099b(f).

B.  COMTA'S ACTIONS WERE ARBITRARY & PRECIOUS AND IN VIOLATION OF
ITS OWN POLICIES AND PROCEDURES.

     Federal courts have recognized claims against federally
recognized accrediting agencies for wrongful denial of accreditation.
In one of the earlier precedents, the District of Columbia Circuit in
1970 employed an analytical approach reminiscent of Equal Protection
Clause analysis.   In Marjorie Webster Junior College v. Middle States
Association of Colleges & Secondary Schools, 432 F.2d 650 (D.C. Cir.
1970) the court observed

               Where membership in, or certification by, such an
               association is a virtual prerequisite to the practice
               of a given profession, courts have scrutinized the
               standards and procedures employed by the association
               notwithstanding their recognition of the fact that

> professional societies possess a specialized competence
> in evaluating the qualifications of an individual
> to engage in professional activities.  The standards
> set must be reasonable, applied with an even hand,
> and not in conflict with the public policy of the
> jurisdiction.

Id. at 655.  "Deprivation of substantial economic or professional

advantages will often be sufficient to warrant judicial action."  Id.

at 655.  The extent to which deference is due to the professional

judgment of the accrediting agency will vary both with the subject

matter at issue and the degree of harm resulting from the agency's

actions.  Id. at 655-6, n. 28.  If a party fails the test for

heightened scrutiny, then the court must apply the rational means

test: the allowance of substantial deference to the decision of the

agency having regard to the ends it serves and the means most

appropriate to such ends.  Id. at 657.

Subsequent cases have refined further the analytical approach

toward decisions of accreditation agencies.  In Rockland Institute v.

Association of Independent Colleges and Schools, 412 F. Supp. 1015

(1976), the court held that its review of a decision of an

accrediting association is limited to a determination that the

association's actions were not arbitrary or unreasonable, and that the decision was supported by substantial evidence and reasonably related to the legitimate professional purposes of the association. Id. at 1016.  In reaching that conclusion, it first must be determined that the accrediting association followed its own established procedures in taking the action that it did.  Id. at 1016.  Rockland Institute also applied the Marjorie Webster balancing test: the extent to which deference is due to the agency's decision will vary both with the subject matter at issue and the degree of harm resulting from the agency's action.  Id. at 1018.

The arbitrary and unreasonable analytical approach was followed in the 8th Circuit, where the court in Medical Institute of Minnesota v. National Association of Trade and Technical Schools, 817 F.2d 1310 (8th Cir. 1987) held that the applicable scope of review includes an inquiry into whether the agency's decision was arbitrary or unreasonable, and whether it was supported by substantial evidence. Id. at 1314.  Further, the agency must conform its actions to fundamental principles of fairness, which principles are flexible and

involve a weighing of the nature of the controversy and the competing interests of the parties on a case by case basis.  Id. at 1314.

The 5th Circuit appeared to follow the subscription to the arbitrary and unreasonable framework.  In Wilfred Academy of Hair & Beauty Culture v. Southern Association of Colleges & Schools, 957 F.2d 210 (5th Cir. 1992) the court addressed the proper scope of review of an accreditation decision made by a voluntary association. Rather than conduct a de novo review of the accreditation decision, the court must focus primarily on whether the agency's internal rules provide a fair and impartial procedure, and whether it followed its rules in making the accreditation decision.  Id. at 214.  Further, courts have consistently limited their review of decisions of voluntary accreditation agencies to whether the decisions were "arbitrary and unreasonable," and whether they were supported by "substantial evidence."  Id. at 214.  It is noteworthy that the Wilfred Academy pronouncements applied to a voluntary accreditation process; query whether such a scope of review would apply to a mandatory accreditation process such as exists in Connecticut.

The 7th Circuit explained the rationale behind the implementation of the arbitrary and unreasonable scope of review. In <u>Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools and Colleges</u>, 44 F.3d 447 (7th Cir. 1994), the defendant rescinded the plaintiff trade school's accreditation. As a result of such action, the plaintiff lost the ability to attract students whose tuition payments were financed by federally guaranteed student loans.

The 7th Circuit explained that accreditation agencies, when recognized by the United States Department of Education, become proxies therefor. If the Department of Education bestowed accreditation, the federal Administrative Procedure Act, set out at 5 U.S.C. section 706(2)(A), (D), would apply. <u>Id</u>. at 449. Therefore, many courts deem accreditation agencies as discharging administrative agency type functions in the accreditation process, and apply administrative agency review criteria to decisions of such accrediting agencies: whether the decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or reached without observance of procedure. <u>Id</u>. at 449.

The 6th Circuit appears also to have followed the aforementioned line of precedent.  In <u>Foundation for Interior Design Education Research v. Savannah College of Art & Design</u>, 244 F.3d 521 (6th Cir. 2001), the plaintiff accrediting agency brought a declaratory judgment action against a college to whom it had denied accreditation.  The 6th Circuit cited an early 7th Circuit decision (<u>North Dakota v. North Central Association of Colleges & Secondary Schools</u>, 99 F.2d 697 (7th Cir. 1938)) in observing that it would interfere with an accrediting agency's decision to rescind a school's accreditation if the decision was "arrived at arbitrarily and without sufficient evidence to support it."  <u>Id.</u> at 527.

The <u>Foundation for Interior Design</u> court echoed <u>Chicago School of Automatic Transmissions</u> in observing that the common law standard for reviewing accreditation decisions in the same standard used to review decisions of administrative agencies: whether the action was arbitrary, capricious, an abuse of discretion or reached without observance of procedure required by law.  244 F.3d at 528.  The court also appeared to embrace to some extent the Equal Protection analytical framework discussed earlier, when it stated where

membership in an organization is a significant requirement to practice in a given profession, courts will scrutinize the standards and procedures used by the agency to select its membership. Id. at 527-8. This dictum is similar to the heightened scrutiny approach discussed in Marjorie Webster Junior College v. Middle States Association of Colleges & Secondary Schools, 432 F.2d 650 (D.C. Cir. 1970).

The most recent judicial interpretation of these aforementioned principles found by the plaintiff here is a 2004 decision out of the Central District of California. In Western State University of Southern California v. American Bar Association, 301 F. Supp. 2d 1129 (C.D. Cal. 2004), the plaintiff law school received a notice of withdrawal by the defendant of the plaintiff's provisional accreditation. After pursuing various hearings and appeals pursuant to the defendant's recondite procedures, the plaintiff applied for a preliminary injunction to enjoin the defendant from removing the plaintiff. The district court held that, in the accreditation context, common law due process requires that the accrediting agency's decision not be arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law, or reached without observance of procedure required by law. <u>Id</u>. at 1135. In so doing, the court's review is deferential, but such review includes an inquiry into whether the accrediting agency followed its own rules. <u>Id</u>. at 1135.

In conclusion, Galen asserts that the following principles can be distilled from the foregoing precedents:

1. Although the scope of review the court must employ is somewhat deferential to the accrediting agency's own judgment in reaching an accreditation decision, the decision may be challenged successfully, and damages awarded therefor, if such decision was either (a) arbitrary, (b) capricious, (c) unreasonable, (d) was the result of an abuse of the agency's discretion, (e) not in accordance with law, (f) reached without observance of procedures required by law, or (g) reached without substantial evidence in support thereof.

2. The accrediting decision may be challenged successfully, and damages awarded therefor, if the accrediting agency, in managing the accreditation process and rendering its decision, failed to follow its own established procedures or rules.

3.   The accrediting decision may be challenged successfully, and damages awarded therefor, if the court applies heightened scrutiny to the accreditation process and resulting decision, and such heightened scrutiny results in a finding that the agency's procedures were unfair or its standards unreasonable.  Such heightened scrutiny may be implemented when an adverse decision results in substantial economic or professional detriment.

The evidence in the present action discloses that accreditation of massage therapy schools in Connecticut is mandatory.  The evidence also disclosed that denial of accreditation results in loss of access to federally guaranteed student loans, the linchpin of a school's long term success.  For these reasons, Galen contends that this court should apply a standard negligence analysis to the facts, to find that (1) COMTA and Ostendorf, in conducting the accreditation process, owed a duty to Galen of exercising reasonable care; (2) COMTA and Ostendorf breached that duty of care; (3) such breach of duty was the proximate cause of Galen's injury; and (4) Galen suffered an injury in the expenditure of $180,000.00 in pursuing the accreditation process, and much greater monetary loss in the

diminished value of its business, as well as its ability to compete with accredited schools of massage therapy.

If the court declines to accept Galen's proposed application of the doctrine of common law negligence to these facts, Galen submits that the court should apply heightened scrutiny to the procedures employed by COMTA in the accreditation process, especially the onsite inspection process, and the concomitant failure of COMTA to verify clearly established matters constituting compliance with COMTA's standards.  In so applying such heightened scrutiny, Galen submits that the court should find, from all of the facts discussed and analyzed in section I of this memorandum, that the procedures employed by COMTA were not just unfair, but fundamentally flawed, and, as such, led inevitably to a flawed result.  Galen challenges not so much the result of the subject accreditation process, but the extremely flawed procedure by which such result was obtained. COMTA's written policy declares, on page 1, paragraph 6 that "breaches in integrity invalidate the process…" (see plaintiffs' Exhibit 2).  By Ostendorf's own admission this policy applied to COMTA as well as the school.  COMTA's manifold violations of its own

policies constitute a breach in the integrity of the process which, in turn, invalidate the process, and, in further logical turn, compromise the accuracy and reasonableness of the final adverse accreditation determination.  In sum, the flawed accreditation process led to a flawed accreditation result which warrants judicial interference.

Finally, if the court eschews our observation to apply heightened scrutiny to this process, Glen contends that COMTA's actions were every bit arbitrary, capricious, unreasonable, and an abuse of discretion, and its decision reached, in reviewing the totality of the circumstances, without substantial evidence in support thereof.  Furthermore, in reaching its accreditation decision, COMTA failed miserably to follow its own established procedures or rules, as evidenced by Lattanzio's comprehensive testimony and the multitude of the defendants' policy violations, inconsistencies and ambiguities the subject of expatiation in section I of this memorandum.

C.  <u>COMTA VIOLATED 34 CFR PART 602</u>.

At the time of the onsite inspection on March 25-26, 2002, the defendant COMTA was undergoing the federal recognition process, and became so recognized shortly after the conclusion of said onsite inspection.  34 CFR Part 602 requires an agency undergoing such process to apply for same and certify compliance therewith under oath.

The federal regulations governing the United States Department of Education's recognition of accrediting agencies are set forth in Title 34, Part 602 of the Code of Federal Regulations.  34 CFR section 602.3 defines an "accrediting agency" as "a legal entity, or that part of a legal entity, that conducts accrediting activities through voluntary, non-federal peer review…"  By entering Connecticut, a mandatory accreditation state regarding massage therapy education, COMTA violated the "voluntary" aspect of the definition of an accrediting agency.

34 CFR section 602.15(a)(2) requires the agency to have "competent and knowledgeable individuals, qualified by education and experience in their own right and trained by the agency on its

standards, policies, and procedures, to conduct its on-site evaluations, establish its policies, and make its accrediting and preaccrediting decisions." COMTA violated this mandate by sending to the Galen onsite inspection individuals who, as discussed in section I of this memorandum, were thoroughly incapable of conducting same.

34 CFR section 602.15(a)(6) requires the agency to have "clear and effective controls against conflicts of interest, or the appearance of conflicts of interest, by the agency's--…(ii) Commissioners; (iii) evaluation team members…" The involvement by Ostendorf with Kitts, and the presence of Linda Derick, executive director of CCMT, as a COMTA commissioner during the pendency of the Galen accreditation proceedings, certainly constituted the "appearance of a conflict of interest" in contravention of section 602.15(a)(6).

34 CFR section 602.17(b) requires the applicant school to prepare self-study reports "following guidance provided by the agency." COMTA violated this mandate by failing to guide Galen in its efforts to comply with COMTA's standards. Goss testified that COMTA does not provide such assistance. Ostendorf, however,

45

acknowledged that COMTA's policy is to provide such guidance. The evidence demonstrated that COMTA provided no such guidance at virtually any stage of the accreditation proceeding. Ostendorf acknowledged that COMTA hired Steve Fridley in January, 2001 as accreditation project specialist specifically to assist schools in achieving accreditation during the first application. Fridley was assigned to Galen in March, 2001 at the pre accreditation workshop, and participated therein, and was represented by COMTA to be an "accreditation specialist." Fridley had no prior experience in the education business, having worked previously at a Barnes & Noble bookstore. Fridley undertook, with barely two months' experience to his credit, the significant process of overseeing Galen's application. Ostendorf further acknowledged that Fridley was not, as of June, 2001, fully trained. These facts further constitute a violation of 3 CFR section 602.15(a)(2), which requires that COMTA provide competent and knowledgeable individuals, qualified by education and experience in their own right and trained by the agency…"

46

34 CFR section 602.18 mandates an agency to consistently apply and enforce its standards.  It further requires the agency to base its accrediting decisions on "the agency's published standards." COMTA, in view of its manifold violations of its own published policies and standards discussed in section I of this memorandum, violated section 602.18.

34 CFR section 602.25(a) requires that an agency's procedures satisfy due process, an afford an applicant "a reasonable period of time to comply with the agency's requests for information and documents."  COMTA's two requests of Galen for additional documentation supplementing Galen's SSRs in December, 2001 and January, 2002, and COMTA's direction to Galen for immediate compliance with such requests ran afoul of the reasonable time standard set forth in section 602.25(a).

34 CFR section 602.26(b) requires the agency to provide written notice of its "final decision to deny" to the Secretary of Education and "the appropriate State licensing or authorized agency…"  This section does not authorize the agency to publish, communicate or otherwise disseminate any other information to such state

authorities.  COMTA's May 21, 2002 dissemination of a copy of the
April 1, 2002 onsite inspection report and the Galen response
thereto, which report was not a final decision of denial to the DHE
violated this federal regulation.  The cover letter of said report
(plaintiffs' Exhibit 18) was labeled "Strictly Confidential."  This
report was also disclosed by DHE in the context of another federal
civil action brought by, and discussed by Lattanzio in his direct
examination, against three individual employees of DHE.  The re-
transmission by DHE constitutes a violation of this policy of strict
confidentiality.  Although Goss stated that COMTA must retain a copy
of the school's application, SSRs and supporting exhibits for seven
years, no federal regulation prescribes such period.  Further, 34 CFR
section 602.28(e) permits the disclosure only of an adverse action
against a previously accredited or preaccredited institution, which
situation is inapposite here, since the onsite inspection report did
not constitute an adverse action, and Galen was neither accredited
nor preaccredited.

     Decisions of accrediting agencies may be challenged if such
decisions are arbitrary, capricious, an abuse of discretion or not in

accordance with law.  <u>Foundation for Interior Design Education</u>

<u>Research v. Savannah College of Art & Design</u>, 244 F.3d 521, 528 (6th

Cir. 2001); <u>Chicago School of Automatic Transmissions, Inc. v.</u>

<u>Accreditation Alliance of Career Schools and Colleges</u>, 44 F.3d 447,

449 (7th Cir. 1994); <u>Western State University of Southern California</u>

<u>v. American Bar Association</u>, 301 F. Supp. 2d 1129, 1135 (C.D. Cal.

2004).

D.  <u>COMTA VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT</u>.

    "It is well settled that in determining whether a practice

violates CUTPA we have adopted the criteria set out in the cigarette

rule by the federal trade commission for determining when a practice

is unfair: (1) whether the practice, without necessarily having been

previously considered unlawful, offends public policy as it has been

established by statutes, the common law, or otherwise- in other

words, it is within at least the penumbra of some common law,

statutory, or other established concept of unfairness; (2) whether it

is immoral, unethical, oppressive, or unscrupulous; (3) whether it

causes substantial injury to consumers, competitors or other

businesspersons…All three criteria do not need to be satisfied to

support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." <u>Updike, Kelly and Spellacy v. Beckett</u>, 269 Conn. 613, 655-6 (2004).  A CUTPA violation may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy.  <u>Jacobs v. Healey Ford-Subaru, Inc.</u>, 231 Conn. 707, 726 (1995).  A party, in demonstrating a CUTPA violation, need not establish that the offending party exercised an intent to deceive.  <u>Id</u>. at 726.  A misrepresentation, fraudulent or innocent, may form the basis of a CUTPA violation.  <u>Calandro v. Allstate Insurance Co.</u>, 63 Conn. App. 602, 609 (2001).

C.G.S. section 42-110b(a) prohibits the engagement by any person "in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  "Trade" and "commerce" are defined in C.G.S. section 42-110a(4) to include the "advertising… or the distribution of any services…"

C.G.S. section 35-1(a) states in pertinent part

[n]o person, except as provided in this subsection,

> shall conduct or transact business in this state,
> under any assumed name, or under any designation,
> name or style, corporate or otherwise, other than
> the real name or names of the person or persons
> conducting or transacting such business, unless
> there has been filed, in the office of the town
> clerk in the town in which such business is or is
> to be conducted or transacted, a certificate stating
> the name under which such business is or is to be
> conducted or transacted and the full name and post-
> office address of each person conducting or transact-
> ing such business or, in the case of a corporation or
> limited liability company using such an assumed name,
> its full name and principal post-office address…
> [F]ailure to comply with the provisions of this sub-
> section shall be deemed to be an unfair or deceptive
> trade practice under subsection (a) of section 42-110b.

The only exceptions set forth in section 35-1(a) pertain to limited

partnerships and limited liability companies.  The evidence, from the

testimony of Lattanzio and in-court admissions by Ostendorf,

disclosed that the defendant COMTA was a fictitious non-entity.  It

was not a corporation, partnership, limited partnership or limited

liability company; it was merely the accreditation arm or commission

of AMTA.  The evidence further disclosed that COMTA entered

Connecticut to accredit CCMT, and to conduct the March 25-26, 2002

onsite visit at the Galen facilities in Wethersfield.  These

activities constitute the conducting or transaction of business

51

contemplated by the first sentence of section 35-1(a).  The evidence
further disclosed that COMTA never obtained from the Connecticut
Secretary of State a license to transact business, nor did it ever
file with the Wethersfield town clerk such "certificate stating the
name under which such business is or is to be conducted or transacted
and the full name and post-office address of each person conducting
or transacting such business."  In addition, COMTA violated section
35-1(a) by failing to disclose the "real name or names of the person
or persons conducting or transacting such business" in lieu of the
filing of the aforementioned certificate.  In COMTA's disclosures to
and communications with the plaintiff, it always referred to itself
as COMTA.  It never prosecuted its business with the plaintiffs under
the real names of Osterdorf and all the commissioners and other
administrative staff of COMTA.  None of the full exhibits discloses
that the real names of the COMTA administrative staff and
commissioners were disclosed or used in the COMTA transactions with
the plaintiffs.  As such, these acts and commissions constitute,
pursuant to section 35-1(a), prima facie an unfair or deceptive trade
practice.

Section 35-1 requires any person doing business to file a trade name certificate in the town in which he does business.  A violation of section 35-1 constitutes a per se violation of CUTPA.  <u>State v. Cardwell</u>, 246 Conn. 721, 744-5 (1998).  Section 35-1 does not require consideration of whether the person conducting the business is easily accessible to the public or whether anyone was actually harmed by the unfair or deceptive trade practice.  <u>Id</u>.  Further, section 35-1 does not require that the offending person have actual knowledge that such practice is unfair or deceptive.  <u>Id</u>.  Accordingly, the plaintiffs should be awarded, pursuant to C.G.S. section 42-110g(d), costs and reasonable attorney's fees.

E.    <u>THE PLAINTIFFS' COMPLAINT SHOULD BE CONSTRUED LIBERALLY.</u>

Lattanzio commenced this action in July, 2002 as a pro se plaintiff for himself and purportedly on behalf of Galen.  He commenced this action with a seven count complaint advancing the following theories of recovery: (1) common law negligence, (2) fraudulent in the inducement, (3) breach of contract, (4) fraudulent misrepresentation, (5) tortious interference with a business

expectancy, (6) trover, and (7) violations of the Connecticut Unfair
Trade Practices Act.

"Since most pro se plaintiffs lack familiarity with the
formalities of pleading requirements, we must construe pro se
complaints liberally, applying a more flexible standard to evaluate
their sufficiency than we would when reviewing a complaint submitted
by counsel.  In order to justify the dismissal of the plaintiff's pro
se complaint, it must be 'beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle him to
relief.'"  Lerman v. Board of Elections in City of New York, 232 F.3d
135, 140 (2nd Cir. 2000)(citing Haines v. Kerner, 404 U.S. 519 (1972).
Courts must construe pro se pleadings broadly and interpret them to
raise the strongest arguments that they suggest.  Cruz v. Gomez, 202
F.3d 593, 597 (2nd Cir. 2000).  "A pro se complaint is to be read
liberally."  Branum v. Clark, 927 F.2d 698, 705 (2nd Cir. 1991).  "The
court should construe a pro se complaint liberally."  Frasier v.
General Electric Co., 930 F.2d 1004, 1007 (2nd Cir. 1991).  The court
should not dismiss such pro se complaint unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim entitling him to relief.  Id. at 1007.

Federal Rule of Civil Procedure 8(a) requires a complaint simply to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  If a complaint fails to allege sufficient facts to provide notice of the claim therein, a defendant can move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).  Further, complaints lacking any merit may be exposed to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Neither procedural device was employed in the subject action.

The first count of the pro se complaint, sounding in negligence, can be construed broadly to state a federal common law claim, the parameters of which were discussed more comprehensively in section II.B of this memorandum.  The defendants filed an answer to the complaint.  The defendants, in Part B of their April 9, 2004 compliance with the trial preparation order, specifically section 3.A (Claims of Law), asserted that "the standard applied by the Courts has consistently been one of 'arbitrary and capricious,'" and cite in

support thereof the <u>Wilfred Academy</u> decision recited in section II.B
of this memorandum.  Thus, the defendants seemingly were well aware
of the prevailing legal standards governing this action at least as
far back as April, 2004.  The defendants knew the claims of the
plaintiffs.  The defendants had ample time to, and did, prepare their
defense.  The defendants cannot claim surprise or prejudice by any
possible abstruse or imprecise draftsmanship of the pro se plaintiff.

Lattanzio moved for permission to amend the complaint and cite
in additional parties, after the appearance of Galen's counsel, which
motion apparently was granted.  However, the subsequent default and
opening thereof, and moratorium on further pleading, foreclosed the
opportunity to amend and refine more particularly the original
complaint.

III. CONCLUSION

The plaintiffs, in view of the foregoing discussion of facts and
applicable legal principles, submit that the Court should find that
the acts of the defendants COMTA and Carole Ostendorf in the
accreditation process were arbitrary, capricious, an abuse of
discretion, contrary to law, contrary to COMTA's own rules, policies,

standards and procedures, and that the accreditation decision was made without substantial evidence or support therefor.  The Court should find further that COMTA committed an unfair trade practice, and enter a judgment in favor of the plaintiff Galen Institute, LLC against both defendants for damages, costs and attorney's fees.

                              Plaintiff Galen Institute, LLC


                              _____
                              Thomas A. Amato
                              357 East Center Street
                              Manchester, CT 06040
                              Telephone (860) 643-0318
                              Federal bar number ct14221
                              Its Attorney

This is to certify that a copy of the foregoing Memorandum was mailed to the following counsel and pro se parties of record on June 10, 2005:

Douglas M. Connors
Brian Del Gatto
Stephen P. Brown
Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP
One Stamford Plaza
263 Tresser Boulevard
Ninth Floor
Stamford, CT 06901

James J. Lattanzio, Jr.
Galen Institute, LLC
1025 Silas Deane Highway
Wethersfield, CT 06109

_____
Thomas A. Amato