TO
couer

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

GALEN INSTITUTE, LLC ET AL          )    DOCKET NO. 3:02CV1232-(PCD)
v.                                  )
COMTA ET AL.                        )    JUNE 13, 2005

### TRIAL MEMORANDUM

The plaintiff James Lattanzio in the above-entitled action hereby submits, pursuant to

Conn. L. Civ. Rule 16(e), the following trial memorandum.

## TABLE OF AUTHORITIES

1. Black's Law Dictionary (7th Ed., ISBN: 0314241302, WEST)

2. Corbin on Contracts (1 vol. Ed. ISBN: 0314284338, WEST)

3. Law Dictionary, (2nd Ed, ISBN: 081202947x, BARRONS)

4. *The American Heritage® Dictionary of the English Language, Fourth Edition ©*
   *2000 by Houghton Mifflin*

5. INTERNATIONAL SCHOOL OF MIDWIFERY and ALAN HUBER v. MIDWIFERY
   EDUCATION ACCREDITATION COUNCIL, CASE NO. 02-80373-CIV-
   RYSKAMP

6. ASSOCIATION OF SPECIALIZED PROFESSIONAL ACCREDITORS (ASPA)

7. US Network For Education Information

8. Prosser, Torts §117 (4th Ed. 1971)

9. www.quackwatch.com featuring the AMTA

## A.  FACTUAL HISTORY OF THE CASE

The complaint was drafted by this pro se plaintiff thus, even where a *pro se* plaintiff confuses various legal theories, it may be appropriate for the court to scrutinize the complaint to determine whether the facts alleged would support a different theory, or to permit a plaintiff to amend his complaint to plead missing elements. *See, Frasier v. General Elec. Co.*, 930 F.2d 1004, 1008 (2d Cir. 1991); *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 763 (2d Cir. 1990). If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." *Hishon* v. *King & Spalding*, <u>467 U. S. 69, 73</u> (1984). The Defendants therefore fully understood the allegations within my complaint, have had legal representation throughout and had ample time to file motions and conduct discovery to clarify any the theories, which they did not. There can be no claim of harm or prejudice to defendants now.

Defendants were presented with a Rule 4 waiver of summons, they ignored it despite the testifying of their CEO-commissioner, Goss that "they" have a complaint procedure that they always follow, and had to be served in person at plaintiff's expense. This plaintiff also points out to this Court as fact that the real legal party American Massage Therapy Association, AMTA, never came forward in this matter until two working days before the date for the hearing in damages. AMTA and their counsel allowed their fictitious entity COMTA to appear, answer and file motions and continue this case for years. In fact, after all of the discovery deadlines had passed, COMTA filed a motion for extension to conduct a deposition, and stated to this Court as a reason for

said extension was that they had a "meritorious defense, to which the deposition was needed for them to file a motion for summary judgment that would come within 30 days after the deposition." Said discovery motion was granted. They conducted the deposition, never filed the "motion for summary judgment" as they represented to this Court, instead, had arranged via the AMTA (not disclosed at this point), headquarters to have this plaintiff served with a summons and complaint after the deposition took place. Within two weeks of the deposition, the defendants took information gained from the deposition (how Galen could still be operating), sent it off to AMTA/COMTA headquarters in Illinois. Said information was then transmitted to their local agents Steven Kitts (owner of Connecticut Center for Massage Therapy (hereinafter CCMT) (Galen's then only competitor in Connecticut) and Linda Derrick (COMTA commissioner and director of CCMT), Derrick then filed a petition with the Connecticut Department of Public Health (DPH) in an attempt to effectively have Galen shut down. Defendants had the time to construct and follow through on their plan to shut the plaintiff down, however ignored what they promised and plead to this Court as the reason for the deposition (to file a dispositive motion within 30 days). Stemming from the above spurious conduct plaintiff asked this Court for a protective order to prevent the further misuse of discovered information.

When this plaintiff learned from a ruling by Connecticut U.S. District Judge Janet Hall that he could not represent Galen, pro se in another related matter, Plaintiff retained attorney Thomas Amato to represent Galen Institute in the matter at hand. Prior to retaining Attorney Amato, when learning that defendant COMTA was in fact the AMTA, a motion to join in AMTA was filed with a paragraph stating that upon joining in

AMTA an amended complaint would be filed. A motion for default against COMTA and AMTA was also filed for their failure to comply with the 30-day corporate disclosure rule. In October, both motions (joining in AMTA and defaulting both AMTA and COMTA) were granted. In November pursuant to this Court's ruling on the default, Plaintiffs filed a motion for judgment and a hearing in damages, which motion was granted and the hearing in damages was scheduled for early February.

Two working days before the scheduled hearing in damages, Plaintiffs were informed that the Defendants approached this Court directly with a tail of woe, and again represented that they had a "meritorious defense" and that they were ignorant of both this Court's default and judgment. In their motion to open the default and set aside the judgment they cited no legal authority contrary to motion practice. This Court was extremely gracious in opening the default and setting aside the judgment to allow the defendants to present their so-called "meritorious defense." This Court sanctioned the Defense counsel for its claims of ignorance of Plaintiff's motions for default and judgment. At the Sanctions hearing, this Court ordered both parties as follows, "no more motions," "no more extensions, "no more amendments," "no more delays" and "be ready for trial." It was due to this order from the Court that this plaintiff with attorney Amato now onboard did not file an amended revised complaint to specifically name in the caption, AMTA and revise the pleadings to include a more lawyerly crafted Complaint. Yet even after this sanction hearing with specific Court orders, the case flow facts clearly show that the defendants and counsel continued to file motions in disregard of the Court's orders.

The foregoing represents indisputable facts regarding the conduct of the Defendants, throughout this matter, which this plaintiff now submits should also be considered in determining the credibility of the defendants.

The defendants and through counsel have consistently misled the plaintiffs and this Court and then even after getting discovered, eluded the truth. The defendants have not presented their "meritorious defense." The testimony of the only defense witnesses, Brenda Griffith, John Goss and Carole Ostendorf, contradicted each other's, contradicted their policies and procedures, contradicted appendix E and contradicted the application of their purported standards, all of which were written assurances given to the plaintiff Galen Institute. These contradictions, as well as the acts of and by the defendant AMTA/COMTA at the hands of defendant Carole Ostendorf, not only were violations of their promises but of State law also and all with an intentional disregard.

## B. Quasi-Implied Contract Between Galen & COMTA

There existed between Galen and Defendant COMTA a Quasi Implied contract, that is born out through the facts of the case. Plaintiff Lattanzio testified that after being solicited by COMTA, he entered into agreement with COMTA that involved promises of dates, time and place and the exchange of monies. Such Quasi implied contract was first manifest when Plaintiff Lattanzio was required to schedule with COMTA attendance at a workshop in Evanston, Illinois. Plaintiff was subjected to a mandatory presentation of information and materials, purportedly. COMTA billed Plaintiff Lattanzio $500 in exchange for its performance in the workshop. The workshop was by the testimony of Ostendorf a necessary first step in the process of accreditation that involved Galen paying a fee directly to the AMTA. It was also the first in a series of many subsequent

5

mandatory requirements which included the Self-Study Report (SSR), two revisions of that same document and the production of copious documents to support the SSRs during the on-site visit. Even before the workshop was an issue, COMTA provided Galen Institute with Pre-Accreditation requirements which included inter alia that Galen be in operation for at least two years, have graduated a minimum of 20 students from its longest running program. Therefore, a Quasi-Implied Contract Existed between Lattanzio and COMTA that each party had agreed to undergo the accreditation process, and the intentions of the parties may be inferred from their actions. The primary reason that such contracts are classified as 'quasi' or 'implied in law' was that they were classified as such both in Roman Law and English Common Law from which our Judicial System is a derivative. (See Corbin on Contracts, One Volume Edition §19 [1952]) This plaintiff would also like to point out to this court that testimony established that COMTA was not a federally recognized accrediting agency when it first conducted business with Galen Institute, therefore any cited case law that precludes that a contract could exist would only come into effect as of July 17, 2002, the actual date COMTA was recognized and would not extinguish any existing agreement or contract that would have been created. However and because COMTA elected to continue their course with Galen, they placed themselves under a heightened burden of Federal law, Title 34-602 et seq. to fully apply and comply to its representations to the US Department of Education.

One of the most compelling facts of this case is that COMTA Policies and Procedures (section IV) require it to defer to State law when that law is the more stringent than COMTA's standing policy, therefore a mandatory analysis of the

Connecticut law, is a point of necessity for a variety of reasons. Chief among those reasons for COMTA is to maintain conformity with its own policies. COMTA failed here also because it lacked the ability to make meaningful statutory interpretation as it produced no statutory or legal expert capable of ascertaining which dictums were the more stringent, the COMTA standard or procedure as compared to state, federal or provincial law. It remains that COMTA by the testimony of all of its witnesses made no comparison of state or federal law as required.

Nevertheless, COMTA required Galen to agree to conformity with the COMTA standard in the event that said standard was determined to be the more stringent of the two. The evidence supplied by Galen Institute further shows as fact, that Galen was authorized under CGS§10a22a-10a22k. In order for Galen to agree on a given point with COMTA, there must have been an agreement in place between the parties. The thing agreed to by COMTA mandate in the current matter is an interpretation of law by COMTA's non-experts. It remains that in order to achieve accreditation, Galen and Lattanzio would have had to comply with COMTA's requirements.

With the innumerable COMTA requirements in place, Galen was required to meet all of the COMTA standards, including ALL sub-criteria in order to achieve accreditation according to Goss, and most of the sub-criteria BUT NOT ALL according to Ostendorf. No comparison of law was made, COMTA violated its own policy. As COMTA required Galen to agree to its subjective interpretation of state and/or federal law, and breached that agreement by failing to apply its own policy [providing legal interpretation], thereby breaching the then established quasi/implied contract by failing to interpret the laws to which COMTA had mandated Galen's agreement.

7

## C. Onsite Report as Evidence of Negligence/Breach

COMTA produced its On-Site report to Galen Institute during the On-site visit of March 25 & 26 2002. It is a document of such poor grammatical construction in the comments section as to render it unreadable. The report, laden with typos and countless contradictions of fact is a reflection not of simple human error, but of gross negligence. It is the product of fraud and deception, and this is born out in the report itself. Misspelled words from the now federally recognized COMTA included the following, "student, word, breadth, read" and were used in a description of a Galen instructor predicated on the following phrase: "She reded [sic] from the board writing work [sic] for work [sic]." Computer spell-checking devices cannot render such a statement. COMTA tried both at Galen and before this Court to pass themselves off as experts, but under the slightest scrutiny, we find not only is COMTA in reality a sophisticated disguise of the AMTA, but that they lacked sufficient professionalism in their conduct as to use the word 'read' in a sentence. The report does not reflect COMTA's promises of the highest integrity or highest quality; it is the arbitrary product of people who sought only to give the appearance of propriety where none existed. No more than minimal work was done on the Galen report, because for COMTA, the outcome was a foregone conclusion. It is this mentality of COMTA, this cavalier attitude of caprice, that they could sit in judgment, in places of learning dealing out condemnation whilst devoid of the most simplistic knowledge as to present their feeble mendacity in a manner that could be conveyed through the written word. Even had the report been favorable to Galen, it could never have been used because the quality of the report itself calls into question COMTA's validity. COMTA boasted that it delivered

8

the highest quality, integrity and promised expert evaluators.  But the fact is, that COMTA's own work product reveals itself as less than honest.  And the Plaintiff asks that this Court treat COMTA's dishonesty as a fact in rendering its decision, especially in light of how strongly COMTA is exposed as fraudulent through its own statements and the obvious inconsistent testimony of its witnesses. (See Plaintiff's Brief, infra)

## D. CUTPA VIOLATIONS: COMTA'S UNFAIR PRACTICES

Connecticut General Statutes §35-1 requires all entities doing business in the State of Connecticut to register with the secretary of state or, in the event of fictitious name use to identify the name proper during the transaction of business.  Plaintiffs contend that they were indirectly damaged directly by AMTA's deceptive practice in failing to register its fictitious COMTA name, more succinctly, CGS§35-1 and CUTPA provide an inherent remedy, in this case, costs, fees and damages, and Plaintiff's request that judicial notice be taken of this special circumstance.

Ostendorf testified that COMTA is obligated to follow its own policies and procedures just as it applicant and member schools are so bound.  A requirement for an applicant school is to be legally organized in the state of its operation, as such COMTA was also required to be legally organized, it was not and in failing to do so violated its own policies and procedures and State law.

By the testimony of plaintiff Lattanzio and the only testimony of the defendants, COMTA made no comparison of state law, as it is required to do per its Policies and Procedures (section IV).  Without a comparison of state law, there can be no accuracy in the process of accreditation.  In Connecticut even the process of accreditation itself is mandatory.  COMTA specifically states in it document entitled Policies & Procedures

9

that if state, federal or provincial law conflicts with a COMTA policy, that the state, federal or provincial law will apply.  Galen was thwarted by COMTA failing to apply this policy in several instances, both by not having anyone on the on-site team qualified to make statutory or legal interpretations and by failing to acknowledge when the state law exceeded the COMTA requirements, as is the case with financial practices under COMTA's Standard 9.0 et seq. By the testimony of plaintiff Lattanzio and the only testimony of the defendants, COMTA made no equivalency determination of what Galen had presented or proposed to adopt within the written narrative of its SSR. In comparison and one fact that did exist is that Galen was in compliance with the State law on this point, which requirements far exceed COMTA standards on their face.

**E.  2002 COMTA Eligibility Criteria**

1. All programs offered by the institution must be massage therapy/bodywork programs.

Note:One program offered at Galen Institute was a 500-hour medical massage program, that is based on the principles of allopathic (western) medicine.  It was specifically not a bodywork program, which makes use of imaginary meridians and concepts (see www.quackwatch.com featuring the AMTA).  The program, in part, prepared its graduates to provide a corrective and restorative therapy and to carry out the instructions of doctors or other persons legally authorized to diagnose and or prescribe massage as a treatment modality.  Galen Institute also maintained a student clinic where students may obtain practical experience.  Nowhere did Galen claim to prepare students for work in a clinical environment, as Griffith represented, rather they are prepared to practice their craft, massage in any environment appropriate to that modality.

2. The institution must have been in operation for a period of at least two years, (This rule had changed from 1999 to 2000).

3. The institution must be legally organized and licensed by the appropriate state education and/or state-licensing agency, which authorize the conduct of business in that state.

4. The institution must offer instruction on the post-secondary level.

5. The institution must offer at least one massage therapy program that requires completion of 500 clock hours of instruction, (a clock hour equals 50 minutes).

6. The institution had to have graduated 20 students from its longest program, (Galen did have a 1,000 New York program, which it had to wait until 20 graduates had completed). Note: Ostendorf's testimony "20 graduates of the longest program seeking accreditation" was not what was written in the COMTA policies and procedures. COMTA promised experts with full knowledge of their policies and procedures, for Ostendorf not to know the COMTA policies and procedures or to "make them up" as she went along would further invalidate her training of the other team members, to which she testified.

COMTA was not legally organized nor was it licensed by the appropriate state education nor any other state-licensing agency which authorizes the conduct of business in Connecticut. Specifically COMTA was not registered to do business in the state of Connecticut via the Secretary of the State's Office, where all businesses are required to register, including foreign corporations and fictitious entities and d/b/a's.

Although in COMTA's initial Answer to the Complaint, they claimed an exemption to this registration, it is a statutory requirement, that if the exemption is claimed, the entity claiming the exemption has the burden of proving the validity such exemption under General Statutes. COMTA has offered no evidence of any legitimate exemption during trial.

## F. CONSEQUENTIAL DAMAGE TO PLAINTIFF GALEN

Had Plaintiff Galen Institute known that the two entities COMTA and AMTA were in fact one and the same, Galen Institute would not have sought accreditation from a business entity it knew to be at variance with Galen's goal and mandatory requirement of Accreditation. This particular deception of Galen by the entity AMTA/COMTA more than any other lead to the instant matter in contention. The costs over the three years of time representing over $190,000 cannot be applied to accreditation through another agency because each agency has its own standards and policies. Galen now must start from the beginning. This plaintiff must stress to this Court to keep in mind that when Galen goes through accreditation with another agency, Galen will have to somehow explain the history and events regarding its dealings with COMTA.

While Galen was free to choose or not choose any professional memberships it believed to be desirable, no other agency would guarantee to complete the process within 33 months.

Galen Institute was financially harmed by the deceptive practices of the entity AMTA/COMTA in that the fictitious entity COMTA caused Galen to hire additional staff, a consultant and address other issues of practicality relating to COMTA's standards and compliance therewith. The direct harm was AMTA's deception as to fictitious COMTA,

as Galen had determined AMTA to be a hostile entity and had begun the process of severing professional ties with AMTA

## G.  2001/02 COMTA ELIGIBILITY TIMELINE

Defendants claim that Galen Institute could have made application as early as September of 2000, but the claim is without merit for the following reasons:

1. The fact that COMTA had altered its own policies did not alter the facts before the court nor the implied contract upon which Plaintiffs relied on to conduct business.

2. The facts before the court clearly indicate that whether or not Galen Institute applied 6 months earlier or 6 months later than it did, the same basic report would have been generated as the school was not substantially different 6 months earlier or later than the COMTA on-site visit.

3. If one reasonably calculates the COMTA timeline in reality, as compared to what it actually did to Galen Institute, COMTA's arbitrary delays and arbitrary requests for revision of the Galen SSR's, the process would have been delayed even further. A careful review of the three types of application "criteria" (within their standards) that had to be met and then approved by COMTA before progressing further in the process will clearly show that it was COMTA that did not live up to its policies, time schedules and promises. An examination of the SSR and supporting exhibits will also clearly show that this process is not one that can be done as simply as the defendants testified.

## H.  Specious Reasoning of COMTA's Introductory Statement:

From COMTA's policies and procedures, Introduction, first paragraph: "The term accreditation implies a generally accepted process by which a school or program is evaluated. Schools with accreditation may, therefore, be said to have achieved a

13

minimum level of excellence based on an accepted set of standards." The reasoning is specious and is indicative of a repugnant theme---the presentation of false information to avoid the appearance of impropriety, which act inherently manifests the impropriety sought to be obscured. Consequently *The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company, gives the following definition of accreditation:* "The act of accrediting or the state of being accredited, especially the granting of approval to an institution of learning by an official review board after the school has met specific requirements." Therefore it may be said that schools, which deal with COMTA, are deceived through subterfuge and doublespeak literally from the moment the process of accreditation begins. COMTA's very first statement to the school owner is a misleading statement which stops short of actually being a definition. Thus by COMTA's own proclamation that any false information presented during the accreditation process invalidates the process. This process was flawed from the beginning and therefore any results are also flawed or invalid.

## I.  GALEN'S ACCREDITATION AS A SECONDARY CONCERN

Whether or not Galen Institute would have been accredited is not the central issue at hand. Whether or not the Defendants followed their policies and procedures is the question proper. Had COMTA made its comparison of state law, as it promised, Galen may have been granted accreditation, as Ostendorf testified that a school can meet the standards without meeting all of the sub-criterion for that standard. However, Goss alleged that a school must meet every single sub-criterion in order to obtain accreditation.    Plaintiff's ask the Court to take judicial notice of these severe

contradictions, and ask with respect, If COMTA's Executive Director (Ostendorf) and its now Chief Executive Officer and commissioner do not know the COMTA Policies and procedures, how could any school be expected to meet the standards set forth and presented through said Policies and Procedures? In addition, how could there be a standard application of any of these policies that have two arbitrary meanings, according to the testimony of two highest-level COMTA operatives.

## J.  LIST OF COMTA POLICY & PROCEDURE VIOLATIONS

Goss and Ostendorf testified that COMTA follows all of the policies and procedures that COMTA requires of its member schools. COMTA, however, followed virtually none of its policies and procedures in the instant matter.  Testimony was also presented by Griffith, which contradicted the testimony of both Goss and Ostendorf.

At approximately 9:35:35 Griffith testified that a video tape that she watched, an advertisement for Galen claimed that the school had a clinical aspect, but she found that it did not have a clinical aspect. The question arises and was not addressed by Defense counsel, a clinical aspect of what?  The school has a student clinic, and the school has a clinical externship.  No evidence of the externship would have been found except those submitted by individual students, as the externship takes place, by definition, outside of the school proper.  This part of Griffith's testimony cannot be understood.

COMTA's Attorney Connors asked Griffith what she was looking for in reviewing standard 7.0. Griffith says that she reviewed graduate questionnaires that had been mailed out to Galen graduates prior to the on-site visit.  Griffith further expounded that she found inconsistencies in those questionnaires at approximately 9:36:20. She

described no process of verification by which the validity of said questionnaires was confirmed. It remains unclear why COMTA would accept mailed documents which could easily have been fabricated, and yet reject actual identified documents such as Galen's lesson plans, course outlines, syllabi and financial statements. Griffith testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures.

Griffith testified that she hoped to determine if Galen Graduates were able to find the employment that were told they would be able to find after completing the program. It is against the law in Connecticut for an occupational school to make such promises of employment. Griffith testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures.

Griffith's testimony on direct confirms via questions put to her by COMTA counsel that she never made the necessary comparison of state law. Counsel asks what were you looking for there repeatedly trying to elicit the process she utilized to verify Galen's compliance. Griffith testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures.

Griffith testified that Galen Graduates are not able to find employment in the way they had previously envisioned and also commented on a lack of skills on part of Galen teachers. There is no way for Galen to address what the individual hopes of its graduates are, nor is Galen allowed to make promises of employment of any kind to its student body. Griffith testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures.

At approximately 9:22:00, Griffith was asked "How did you verify standards. Her response did not contain any comparison of state law to COMTA policies, violating the COMTA Policies and Procedures which promise that such a comparison must of necessity be made, and that state, federal or provincial law must supercede the COMTA policies, and further gives other conditions which require additional comparisons of law to COMTA standards, but such policy was never followed by COMTA.

Griffith testified that the primary data she relied upon was collected from questionnaires and surveys, and that she interviewed only 2 faculty at Galen Institute, no graduates and no students. Ostendorf insists, however that Griffith did interview graduates and students. A review of the on-site report shows no specific data from the surveys was given to Galen at the time nor during discovery. Galen cannot know what COMTA put in the surveys as it (nor Plaintiff Lattanzio) was ever provided or permitted to see a copy of the surveys/questionnaires in question. Griffith also testified at approximately 9:48:40 that she talked to many people, staff and administrative staff, contradicting her previous testimony that she spoke only with two faculty. At approximately 9:49:50 Griffith testified that she personally interviewed only Instructors Rieff and Priest. Griffith testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures.

Attorney Connors stated over an objection of Mr. Amato's that whether or not Galen was worthy of accreditation based on what evidence COMTA had to consider during the on-site visit was the issue at hand. However, Ostendorf contradicted this assertion of her counsel when she testified that the purpose of the on-site team was to

determine whether evidence existed to verify compliance with COMTA standards. Ostendorf testified that she never made a comparison of state law to COMTA policy, on this or any other point, as required by COMTA's Policies and Procedures document.

Griffith, upon being asked to describe the collaborative process at approximately 9:39:30----further offered no testimony as to a collaborative comparison of state law. She was asked, if she signed a confidentiality agreement as an on-site team member and what her understanding of that agreement was. She responded that she was presented with and signed a confidentiality agreement during her orientation at a hotel (the name of which she could not recall). She further stated that her understanding of the confidentiality agreement was that all of the materials under COMTA review were the property of Galen that COMTA does not share said property with anyone and that said Galen materials were to be used only for verification during the on-site visit. (Griffith testimony at approximately 9:41:05)

Ostendorf faxed the Galen Property to which Griffith had testified and which were, purportedly protected, to the Connecticut Department of Public Health May 21, 2001 in violation of the COMTA Policies and Procedures and Confidentiality agreement.

At approximately 9:47:51 Griffith testified that she recalls only 1 door at Galen institute, and that it was not big enough for a wheelchair to pass through. In fact a to-scale floor plan was submitted to COMTA as part of the SSR, it could plainly be seen that the double doors at the entrance could be open to 7 feet wide.

At approximately 9:51:24 Griffith testified that criteria on standards, marked yes or no, meant that the school meets or does not meet the corresponding criterion.

Ostendorf testified that the yes or no referred to whether or not sufficient evidence existed as to enable the team to verify the corresponding standard.

At approximately 9:52:35 Griffith testified that she wrote the commentary for standards 3,5, 7.  Ostendorf claimed to have written all of the commentary in the on-site report.

Goss testified that he did not know what month it was at approximately 12:09:35.

Upon being asked why he altered the site visitors report at approximately 12:17:55 Goss stated that he recommended changes to increase some of Galen's ratings and gave an example that the team found no sexual harassment policy, yet there was one.  The sexual harassment policy was presented to the on-site team as an exhibit in the SSR.  Therefore, according to Goss', the on-site team could not even determine whether or not it had a document in its possession.

Goss testified that COMTA was required by federal law to keep the records of Galen Institute for a period of 7 years.  There is no such Federal law.

## K. CONFIDENTIALITY & ACCREDITATION

COMTA breached its confidentially and damaged the reputation of plaintiff James Lattanzio. The testimony of Goss established that COMTA shares no accreditation documents with any other agency, Federal, State or otherwise. Ostendorf testified that she transmitted a copy of the COMTA onsite report and Galen's response in April-May 2001, just days after receiving them to Patricia Santoro of the Connecticut Department of Higher Education. The Connecticut Department of Higher Education in a motion to dismiss, case no 3:02-CV-1637 (JCH) in Bridgeport Federal Court placed these very same documents as exhibits within said motion. Ostendorf breached confidentially and

then allowed the information to be made public by the DHE. COMTA never followed

through on its accreditation process to correct any comments that were in fact not true,

nor did it send any corrected information to the DHE. Lattanzio never had an opportunity

or due process to address this breach and publishing of these comments. As this Court

can read within the COMTA report (comments) it is laden with negative opinions, which

have been pointed out to be not true. This constitutes such a serious breach of strict

confidentially that was promised by COMTA. This Court should infer into the pleadings

(pro se) that defamation has also occurred and Galen as well as Lattanzio is entitled to

damages.

The following argument is extracted from: INTERNATIONAL SCHOOL OF MIDWIFERY and ALAN HUBER v. MIDWIFERY EDUCATION ACCREDITATION COUNCIL CASE NO. 02-80373-CIV-RYSKAMP in the Federal Court in Florida, as presented by The Association of Specialized and Professional Accreditors, as Amicus to the Court on part of the Defendants. It is of note that Defendant COMTA is a member of the ASPA.

Almost all ASPA members (43) currently accredit programs or schools in Florida. Likewise, all ASPA members maintain policies relating to the confidentiality of accreditation information and materials in their possession.[23] Adherence to confidentiality policies is vital to the operation of the accreditation process of ASPA members and, indeed, all accreditors.

     Intrinsic to private accreditation is the promotion of candor within its process, which may include constructive criticism that leads to improvement in the educational quality of a program or school. Maintaining confidentiality within the accreditation process promotes candor. Personnel within accredited entities are more forthright and candid because they trust that the information they disclose during the accreditation process will be used solely within that process and will not be otherwise released.[1]

     Accreditors follow their confidentiality policies when investigating complaints that may impact the quality of the educational program. Students who believe that a program

---

[23] ASPA members subscribe to the ASPA "Member Code of Good Practice," (see, www.aspa-usa.org) which provides, among other things, that each member "Exhibits integrity and professionalism in the conduct of its operation.....Demonstrates continuing care with policies, procedures, and operations regarding due process, conflict of interest, confidentiality, and consistent application of standards." (emphasis provided).

[1] Confidentiality is less important to the state regulatory process, inherent in which is the power to compel testimony and production of documents.

or school's failure to comply with accreditation standards is harming their education do contact accreditors. Faculty members or other "whistle blowers" connected to the program also contact accreditors. They often ask that the accreditor protect their identity while the complaint is investigated. Per its confidentiality policy, the accreditor contacts the program about the complaint without identifying the complainant, unless the complainant authorizes the disclosure of his/her identity. The accreditor restricts the use of the information received from the complainant and any investigation to the accreditation process.

Disclosure of accreditation records under public record laws (of any state, not just Florida) would have a "chilling effect" on the accrediting agency's ability to receive full and frank information and would ultimately reduce confidence in the quality assurance aspect of accreditation. This would be harmful to all who now rely on accreditation, including the public and prospective students.

An accrediting agency has no power to compel programs seeking accreditation to submit complete and accurate information, but must rely on programs and schools that apply for accreditation to provide information willingly. Assurance of confidentiality allows programs and schools to provide sensitive and sometimes proprietary information without fear of misuse by third parties who might wish to access confidential information for reasons unrelated to accreditation.

Lack of access to full information (because it is not protected and confidential) would hinder the ability of accreditors to do their job, which is to foster the provision of adequate training consistent with national standards. A ruling that accreditation records relating to programs and schools in Florida are subject to the Florida Public Records Act would destroy the confidentiality element of the process, and weaken accreditation. A ruling that the records of the accrediting agency relating to programs, schools, and general matters not directly related to Florida are subject to the Florida Public Records Act would create even broader harm. Accreditors would simply have to step back and decide, each individually, how much their performing accreditation functions in Florida would adversely affect their accreditation activities generally, and what to do about it.

## APPENDIX 1

US Network For Education Information give the following definition of a legitimate accreditation process on its website:

http://www.ed.gov/about/offices/list/ous/international/usnei/us/edlite-accred-whatis.html

Accreditation includes the following steps that must be followed in order for it to be a legitimate process:

1. The accrediting association establishes, and periodically refines, its standards and policies to be followed by all successful candidates for accreditation or re-accreditation;

2. An institution or program faculty petitions the association for membership as an accredited entity, or is notified, if it is already a member, that the time for re-

accreditation has come;  In the matter at Hand, Galen Institute was solicited by COMTA, in contravention of this maxim.

3. The institution or program begins a process of preparing and conducting an intensive and thorough self-study led by a designated committee of faculty and staff and following guidelines set forth by the accrediting association;  No such designated committee was addressed by COMTA and COMTA withheld the necessary guidelines for accreditation compliance, instead dealing them out piecemeal, explanations of standards were presented at the accreditation workshop, the sub-criteria were presented only after the original SSR was presented according to then current COMTA requirements.  For the two revisions of the SSR, COMTA simply invented criteria outside of its previously divulged scope.

4. The accrediting association selects a team of external academic and administrative experts from other similar institutions or programs, and this team reviews the self-study report and then visits the institution or program for an on-site inspection, following the associations inspection and evaluation guidelines; In the matter at hand, COMTA produced no experts from similar institutions.  Galen Institute being a medical massage program, and Connecticut's first medical massage program, such experts would have needed to come from a school with a pioneer program or at the very least a medically based program.  Griffith testified that she never measured the doors at Galen Institute, but claimed that they were insufficient to allow a wheelchair to pass through.  The doors at Galen Institute do in fact allow wheelchair access and egress.

5. The evaluation team issues a report recommending for or against accreditation or re-accreditation, and enumerating any conditions that need to be met before full positive approval may be given.  COMTA's on-site team did not make a recommendation to COMTA's commissioners; it simply listed arbitrary ratings which in most cases conflicted with the writing in other parts of the on-site report.  Therefore, no recommendation was made, as required, nor could the information contained within the on-site report be relied upon by any reasonable person, due to the frequent appearance of mendacity within the information itself.

6. The accrediting association's members vote on the status of the candidate or member based on the evaluation team report, and the association places the name and information about successful candidates and re-accredited members in the next annual edition of its official approved list. In the current matter, COMTA's commission alone voted, not its members, in fact the on-site team members are precluded by COMTA's by-laws from having a vote.

## Appendix 2

Connecticut General Statutes:

CHAPTER 620:TRADE NAMES

§35-1

**Sec. 35-1. Use of fictitious business names. Prohibitions and exceptions. Penalty. Unfair trade practices.** (a) No person, except as provided in this subsection, shall conduct or transact business in this state, under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the person or persons conducting or transacting such business, unless there has been filed, in the office of the town clerk in the town in which such business is or is to be conducted or transacted, a certificate stating the name under which such business is or is to be conducted or transacted and the full name and post-office address of each person conducting or transacting such business or, in the case of a corporation or limited liability company using such an assumed name, its full name and principal post-office address. Such certificate shall be executed by all of such persons or, in the case of a corporation or limited liability company, by an authorized officer thereof, and acknowledged before an authority qualified to administer oaths. Each town clerk shall keep an alphabetical index of the names of all persons filing such certificates and of all names or styles assumed as provided in this subsection and, for the indexing and filing of each such certificate, shall receive the statutory filing fee for documents established in section 7-34a, to be paid by the person filing such certificate. A copy of any such certificate, certified by the town clerk in whose office the same has been filed, shall be presumptive evidence, in all courts in this state, of the facts contained in such certificate. The provisions of this subsection shall not prevent the lawful use of a partnership name or designation if such partnership name or designation includes the true surname of at least one of the persons composing such partnership. This subsection shall not apply to: (1) Any limited partnership, as defined in section 34-9, provided such limited partnership (A) has (i) filed a certificate as provided for in section 34-10, or (ii) registered with the Secretary of the State as provided in section 34-38g and (B) conducts or transacts business under the name stated in the certificate or registered with the Secretary of the State, or (2) any limited liability company, as defined in section 34-101, provided such limited liability company (A) has (i) filed articles of organization as provided for in section 34-120, or (ii) registered with the Secretary of the State as provided in section 34-223 and (B) conducts or transacts business under the name stated in the articles of organization or registered with the Secretary of the State. Any person conducting or transacting business in violation of the provisions of this subsection shall be fined not more than five hundred dollars or imprisoned not more than one year. Failure to comply with the provisions of this subsection shall be deemed to be an unfair or deceptive trade practice under subsection (a) of section 42-110b.

(b) No person shall use, in any printed advertisement, an assumed or fictitious name for the conduct of such person's business that includes the name of any municipality in this state in such a manner as to suggest that such person's business is located in such municipality unless: (1) Such person's business is, in fact, located in such municipality; or (2) such person includes in any printed advertisement the complete street address of the location from which such person's business is actually conducted, including the city or town and, if located outside of Connecticut, the state in which such person's business is located. This subsection shall not apply to the use of (A) any

trademark or service mark registered under the laws of this state or under federal law, (B) any such name that, when applied to the goods or services of such person's business, is merely descriptive of them, or (C) any such name that is merely a surname. A violation of the provisions of this subsection by a person conducting business under an assumed or fictitious name that includes the name of a municipality in this state shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b. Nothing in this subsection shall be construed to impose any such assumed or fictitious name.liability on any publisher that relies on the written assurances of a person placing such printed advertisement that such person has authority to use any

BY,

James Lattanzio, pro se
Plaintiff

This is to certify that a copy of the foregoing Memorandum was served on the following counsel of record on June 13, 2005:

Douglas M. Connors
Brian Del Gatto
Stephen P. Brown
Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP
One Stamford Plaza
263 Tresser Boulevard
Ninth Floor
Stamford, CT 06901

Thoams A Amato
357 E. Center Street
Manchester, CT 06040

James Lattanzio