UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 JUN 27 P 2: 59

GALEN INSTITUTE, LLC, AND JIM LATTANZIO
          Plaintiffs
VS.

CASE NUMBER
3:02CV1232-PCD

COMTA, COMMISSION ON MASSAGE THERAPY
ACCREDITATION AND CAROLE OSTENDORF,
INDIVIDUALLY AND AS EXECUTIVE DIRECTOR OF
COMTA
          Defendants

JUNE 27, 2005

## DEFENDANTS' TRIAL MEMORANDUM

The defendants, COMMISSION ON MASSAGE THERAPY ACCREDITATION (hereinafter COMTA) and CAROLE OSTENDORF, (hereinafter OSTENDORF) hereby submit, pursuant to D. Conn. L. Civ. Rule 16(e), the following trial memorandum.

## I.    DEFENDANTS' PROPOSED FINDING OF FACTS

### A.    GALEN'S SOLE PURPOSE OF SEEKING ACCREDITATION WAS TO COMPLY WITH C.G.S. § 20-206b

Plaintiff, GALEN INSTITUTE (hereinafter GALEN) attempted to obtain accreditation of its massage therapy program at its Wethersfield Connecticut campus from Defendant, COMTA during 2001 – 2002. LATTANZIO repeatedly testified that the "brass ring" was access to federal funds and financial aid for its students (LATTANZIO testimony 5/5/05 10:37:33 a.m.). The evidence does not support this contention. The

1

921971.1

only conclusion that can be reached based upon the evidence is that the sole purpose

of GALEN's attempt at achieving accreditation was to satisfy Connecticut General

Statute §20-206b(a) which reads in pertinent part:

> **"Each person seeking licensure as a massage therapist shall . . .
> present evidence that the applicant (1) has graduated from a school
> of massage therapy offering a course of study of not less than five
> hundred classroom hours, with the instructor present, and, at the
> time of the applicants graduation, was either (A) accredited by an
> agency recognized by the United States Department of Education . . .
> or (B) accredited by the Commission on Massage Therapy
> Accreditation . . . "[1]**

An ancillary, and wholly separate, benefit of achieving accreditation from a

federally recognized accrediting agency is that the school would then be able to apply to

the United States Department of Education (hereinafter USDE) so that its students may

become eligible to receive federal financial aid and student loans.  When GALEN first

approached COMTA in 1999, COMTA was not a federally recognized accrediting

agency.  GALEN was aware of this fact in 1999. (LATTANZIO testimony 5/3/05 2:55:20

p.m.; Plaintiffs' Exhibit 1). When LATTANZIO, on behalf of GALEN, attended the pre-

accreditation workshop in March 2001, COMTA was not a federally recognized

accrediting agency.   GALEN was aware of this fact in March 2001 (LATTANZIO

testimony 5/3/05 3:20:53 p.m.; OSTENDORF testimony 5/16/05 9:14 a.m.).   When

COMTA conducted its site visit on March 25, 2002, and March 26, 2002, COMTA was

not a federally recognized accrediting agency.  GALEN institute was aware of this fact in

March 2002 during the site visit as well (LATTANZIO testimony 5/10/05 11:04:06 a.m.;

OSTENDORF testimony 5/16/05 9:14 a.m.).   Throughout the accreditation process,

---

[1] In plaintiffs' Trial Memorandum, they allege that COMTA lobbied to be inserted in the statute, however, no such evidence was presented at trial to support this allegation. Regardless of whether the allegation is true or not, it would be irrelevant to the issues in dispute, and the defendants argue the allegation should be disregarded in its entirety.

2

GALEN never expressed any concerns that COMTA was not federally recognized. (OSTENDORF testimony 5/16/05 9:15 a.m.). GALEN attempted to withdraw its application for accreditation on May 21, 2002. (plaintiffs' Exhibit 20). COMTA became federally recognized in July 2002 by the USDE, the federal agency responsible for recognition of accrediting agencies. (LATTANZIO testimony 5/10/05 11:04:23 a.m.).

LATTANZIO testified that he attended at least one and possibly two other federally recognized accreditation workshops in addition to the COMTA workshop in March 2001. (LATTANZIO testimony 5/3/05 2:53:00 p.m.).  He testified that he chose COMTA because COMTA was named in the Connecticut statute. In fact, GALEN chose COMTA knowing they were not federally recognized.  As such, even if successful in its COMTA accreditation efforts, there would be no guarantee that COMTA would ever become federally recognized. There was, therefore a risk, which GALEN was aware of, that even if it were successful in its efforts to achieve  COMTA accreditation, its students would still be denied access to federal financial aid and federal funds.  If this were GALEN'S true intention for seeking accreditation as GALEN contends, GALEN would have sought accreditation from an agency that was federally recognized so that a successful accreditation would allow GALEN to apply for access for its students.

GALEN subsequently became recognized by the Counsel Overseeing Medical & Massage Therapy Accreditation (hereinafter COMMTA). (LATTANZIO testimony 5/10/05 2:26:10 p.m.). COMMTA is not a federally recognized accrediting agency. (LATTANZIO testimony 5/10/05 2:26:53 p.m.).  Furthermore, COMMTA was formed by Terrance Jacobs, GALEN'S accountant and subsequently Chaired by Chris Folkers, GALEN'S damage expert, who was never called to testify in this matter. (LATTANZIO

3

testimony 5/10/05 2:26:35 p.m.).   LATTANZIO further testified that COMMTA utilized

GALEN as a test school and that COMMTA does not apply nationwide standards during

its accreditation process.   As such, COMMTA is not capable of meeting the stringent

standards of the USDE for federal recognition and was in fact chosen by GALEN due to

these lesser standards. In order to then meet the requirements of C.G.S. §20-206b,

following a petition filed with DPH in 2003, GALEN's accrediting agency, COMMTA

registered with the state of Connecticut.  However, rather than registering under its own

name, COMMTA converted COMTA's trademark and registered under the name

Commission on Massage Therapy Accreditation, or COMTA. (LATTANZIO testimony

5/10/05  11:24:55).   However,  accreditation  by  either  COMMTA  or  the  newly

incorporated "COMTA" would not result in GALEN's eligibility to apply for access to

federal funds for its students. This clearly demonstrates GALEN's true purpose in

seeking accreditation: compliance with state law.

Further evidence can be seen following in GALEN's attempt to withdraw from the

COMTA accreditation process following the site visit.  This attempted withdrawal was

due to GALEN's perception that COMTA accreditation was no longer necessary.

GALEN responded to the site report on May 19, 2001. In its response, GALEN wrote:

> "In a meeting with the Connecticut Department of Public health (the final authority
> in licensure) on May 14, 2001, Jan Cordero, Supervisor of Massage Therapy
> Licensure directly contradicted this finding.   Currently, the requirement of
> accreditation by GALEN is moot and all GALEN Graduates who successfully
> pass the NCE are eligible for licensure in the state of Connecticut."

(Plaintiff's Exhibit page 2).

GALEN's attempt to withdraw their application came on May 21, 2002 only *after*

being advised that its graduates would continue to be eligible for licensure despite the

clear language of Connecticut General Statute §20-206b(a). (Plaintiffs' Exhibit 32). As such, COMTA accreditation was no longer perceived as necessary by GALEN to meet the requirements for licensure in Connecticut. Therefore, GALEN no longer needed to continue in its efforts for accreditation, COMTA or by any other federally recognized agency and chose to terminate any such efforts.

The fact that GALEN did ultimately seek and obtain accreditation from COMMTA, rather than a federally recognized agency clearly demonstrates GALEN's one and true purpose for seeking accreditation from COMTA: satisfying Connecticut General Statute §20-206b(a). Accreditation by COMMTA does not afford access to federal financial aid, and thus any support for the contention made by GALEN that this was the "brass ring" can not found in the facts presented.

**B.    GALEN WAS THE SOLE CAUSE OF ANY DELAYS IN THE ACCREDITATION PROCESS**

GALEN graduates were given a 33 month grace period to allow GALEN to achieve the necessary accreditation as required by Connecticut General Statute §20-206b(a). This savings period is enumerated in Connecticut General Statute §20-206b(c) which reads in pertinent part that the Department of Public Health (hereinafter DPH) may:

> "issue a license to an applicant whose school of massage therapy does not satisfy the requirement of subparagraph (A) or (B) of subdivision (1) of said subsection [section 20-206b(a)], provided the school held, at the time of the applicant's graduation, a certificate issued by the Commissioner of Education pursuant to section 10-7b and provided the applicant graduated within thirty-three months of the date said school first offered the curriculum completed by the applicant. No license shall be issued under this subsection to a graduate of a school that fails to apply for and obtain accreditation by (1) an accrediting agency recognized by the United States

Department of Education or (2) the Commission on Massage Therapy
Accreditation within thirty-three months of the date said school first offered
the curriculum."

Galen received from COMTA in 1999, the procedures and standards that applied
to the accreditation process. These procedures required at that time, that a school
teach a massage therapy program for at least two years and graduate a minimum of
twenty students. In furtherance of its application for federal recognition, COMTA
changed these requirements in 1999 - 2000 to become less stringent. The new criteria
changed the requirements to a less stringent requirement that the applicant school be in
operation for two years rather than the massage program be two years old.
(OSTENDORF testimony 5/16/05 9:06 a.m.; LATTANZIO testimony 5/3/05 3:12:33
p.m.). This would, in effect, accelerate the time in which an institution qualifies to
submit its application for accreditation. Graduation figures contained in the plaintiffs'
Exhibit 14A demonstrate that by September 2000, twenty one students had graduated
(OSTENDORF testimony 5/16/05 9:09 a.m.). GALEN had been authorized as
educational institution on February 4, 1998, thus making GALEN eligible to apply for
accreditation as early as September 2000 (LATTANZIO testimony 5/3/05 11:46:17
a.m.). OSTENDORF confirmed GALEN'S eligibility to file an application as early as
September 2000 (OSTENDORF testimony 5/16/05 9:09 a.m.). GALEN did not file an
application in September 2000, nor had GALEN attended a required pre-accreditation
workshop before September 2000, the earliest in which GALEN could have submitted
its application.

LATTANZIO'S first contact with COMTA was in December 2000 or January 2001
(OSTENDORF testimony 5/16/05 9:09 a.m.). LATTANZIO testified that he was aware

6

of a January 2001 workshop which he admitted he could have attended (LATTANZIO testimony 5/3/05 3:15:38 p.m.; OSTENDORF testimony 5/16/05 9:10 a.m.). He did not. Instead, without offering explanation, LATTANZIO chose to wait an additional two months until March 2001, to attend the required workshop (LATTANZIO testimony 5/3/05 3:16:13 p.m.). The cause of this two month delay in commencing the accreditation process clearly rests with GALEN and not COMTA

At the workshop, LATTANZIO advised OSTENDORF of the 33 month time frame and told her that he had attended other massage therapy accreditation workshops. LATTANZIO did not tell OSTENDORF nor COMTA that he intended to complete an application with COMTA (OSTENDORF testimony 5/16/05 9:13 a.m.). An application could have been filed before the workshop, during the workshop, or immediately upon conclusion of the workshop (OSTENDORF testimony 5/16/05 9:12 a.m.). GALEN chose none of these options. Again, without explanation, GALEN chose to wait five months until August 2001 to file its application. (LATTANZIO testimony 5/10/05 p.m.).

Not every attendee at any given workshop will, in fact, file an application with COMTA (OSTENDORF testimony 5/16/05 9:12 a.m.). LATTANZIO attended two workshops given by other accrediting agencies, yet only applied to COMTA. (LATTANZIO testimony 5/3/05 2:53 p.m.). As such, COMTA could not have been aware of GALEN'S intention of pursuing accreditation through COMTA until the application was received five months after the workshop. As such, the five month delay from March 2001 until August 2001 is again, solely due to the conduct of GALEN and or LATTANZIO and not as a result of COMTA'S actions.

At the workshop, various materials were distributed to the attendees, including a timeline within which an applicant can expect for the accreditation process to occur. (Plaintiffs' Exhibit 1). This information was first made available to GALEN in 1999. The aforementioned timeline begins with the filing of an application for accreditation in the first month. In this case, August 2001. Thereafter, come the self study period and preparation of the Self Study Report (hereinafter SSR). The published timeline indicates that the self study period and submission of the SSR occur in months two through eight. The published timeline further informs an applicant school that an on-site visit can be anticipated to occur in months nine and/or ten. (Plaintiffs' Exhibit 1). In this case, GALEN should have anticipated an on site visit in April or May 2002. The site visit occurred in March 2002; one to two months ahead of the expected time frame. COMTA did not delay the site visit as plaintiffs allege, but rather accelerated the process.

OSTENDORF did make statements at the March 2001 workshop to the effect that no school that has applied to COMTA for accreditation had ever been denied accreditation. No evidence was presented to demonstrate that accreditation of an applicant school was assured on its first attempt nor that accreditation would be guaranteed at all. The evidence demonstrated that OSTENDORF did <u>not</u> guarantee GALEN would be successful, and further, that GALEN is the lone applicant not to have been accredited by COMTA. (Goss testimony 5/12/05 12:38:31 p.m.). Logic dictates that if GALEN is the only school which failed to achieve accreditation by COMTA, then any statements made by OSTENDORF before GALEN'S in May 2003 denial, that no school has been denied, must necessarily have been true when made.

## C.     COMTA DID PROVIDE ASSISTANCE TO GALEN DURING THE ACCREDITATION PROCESS

Another complaint articulated by plaintiffs at trial was the alleged lack of assistance provided to GALEN by COMTA.  However, evidence clearly demonstrates that COMTA did attempt to assist GALEN in completing the SSR and preparing for the site visit. (Goss testimony 5/12/05 12:48:40 p.m.).   GALEN attempts to argue that the site report dated April 1, 2002 does not contain advice for correcting any deficiencies, and as such, violates COMTA policies and procedures.  GALEN, however, once again misstates the evidence introduced in this case.  While it is true that the site report itself offers no assistance or advice, the evidence demonstrated that the purpose of the site report was to communicate the findings of the site team; to give a snapshot so to speak as to what was observed and verified during the visit.  (OSTENDORF testimony 5/16/05 9:28:17 a.m.; Griffith testimony 5/12/05 9:05:30 & 9:05:44 a.m.).  This is clearly stated in the cover letter sent with the site report which reads in pertinent part:   "Please remember that these findings represent only the work of the site team."   (Plaintiffs' Exhibit 18).  The advice, assistance and help which GALEN claims were lacking are not the purpose of the site report.

The advice, assistance and help are to be provided to the applicant during the eight to nine month period of self study to which revisions to the SSR and supplemental documentation, if necessary, are requested. This is so that the applicant school is in a position to conduct a favorable site visit.   The evidence in this case clearly demonstrated that this advice and assistance were offered to, and rejected by GALEN during the period of self study.

9

COMTA attempted to provide GALEN with assistance and advice after their receipt of the October 2001 self study report.   One such attempt is evidenced by way of letter dated November 13, 2001 from Steve Fridley to GALEN (OSTENDORF testimony 5/16/05 9:19 a.m.).  In this letter, 29 sub-standards were identified as not being properly documented in the initial SSR received by COMTA in October 2001. These deficiencies were clearly articulated to GALEN within that letter. (Plaintiffs' Exhibit 13).   Additionally, twice within the body of that letter, Mr. Fridley asked LATTANZIO to contact him with questions or if GALEN needed assistance in providing the necessary documentation (see also OSTENDORF testimony 5/16/05 9:18 a.m.).

LATTANZIO did in fact take Mr. Fridley up on his offer as he testified that there were several instances of inquiry made of Mr. Fridley with respect to the standards (LATTANZIO testimony 5/3/05 4:21:09; 5/5/05 4:52:14 p.m.; 5/5/05 4:53:05 p.m. and 5/9/05 11:01:00). LATTANZIO'S own testimony reveals that he was "constantly told to change the way we answered our SSR to fit the COMTA standard... We didn't do that." (LATTANZIO testimony 5/5/05 4:53:18 p.m.).  He later repeated this position when he testified that "I refused to have my staff, and I refused to write up a document that, that we were requested to alter the way we we, we, the operation of the school." (LATTANZIO testimony 5/5/05 4:53:40 p.m.).  It is therefore evident that GALEN and LATTANZIO'S claims with respect to COMTA not offering advice and assistance is unsupported by the record. Rather, the record is replete with evidence that assistance was offered on numerous occasions and flatly and consistently rejected by GALEN.

COMTA further offered assistance to GALEN via a telephone conversation between OSTENDORF and LATTANZIO in January 2002.   GALEN failed in their

921971.1

December 1, 2002 revised SSR to provide all the documentation and verifications requested by Mr. Fridley in the November 13, 2001 request. After reviewing the December 2001 submission OSTENDORF, contacted LATTANZIO once again to assist in explaining the areas that were lacking and to request further verification (OSTENDORF testimony 5/16/05 9:20 a.m.). During that conversation, OSTENDORF expressed her doubts that GALEN was sufficiently prepared for a site visit prior to the April 2002 meeting of the commissioners. If a school was felt to be unprepared by COMTA for the site visit, the visit would be scheduled if the school insisted upon it. (Goss testimony 5/12/05 12:51:30 p.m). LATTANZIO was upset since this would result in a delay in accreditation decision until October 2002, placing GALEN beyond thirty-three month statutory time period (OSTENDORF testimony 5/16/05 9:22 a.m.). Thereafter, GALEN faxed additional documents to COMTA on January 18, 2002 and further requested the site visit (OSTENDORF testimony 5/16/05 9:23 a.m. See also Plaintiffs' Exhibit 17 and/or 17A). It was based upon this fax that COMTA decided to schedule the March 2002 site visit. (OSTENDORF testimony 5/16/05 9:23 a.m.).

Once again, assistance was offered by COMTA to GALEN in the November 4, 2002 letter wherein GALEN was advised that their accreditation application would be deferred for six months. Again, numerous areas of deficiencies were noted and once again COMTA offered ". . . to be available to you for clarification and consultation during your development of the responses in your interim report." (Plaintiffs' Exhibit 23). GALEN refused this offer and, in fact, took no further action with respect to their application which it had attempted to withdraw five months earlier. As such, GALEN'S complaint with respect to the lack of advice and assistance provided by COMTA during

11

the accreditation process is unsupported by the evidence.  The evidence, in fact, demonstrates the opposite:  Advice and assistance were offered on numerous occasions over the course of a year, but each time rejected by GALEN.  Plaintiffs' claims in this regard are without merit.

## D.    THE COMTA SITE TEAM WAS QUALIFIED

GALEN attempts to argue that the site team members were not qualified to conduct a review of the GALEN program as they did not compare COMTA's standards to state law.  Yet, LATTANZIO admitted that "COMTA was aware of the law in Connecticut." (LATTANZIO testimony 5/3/05 3:21:40 p.m.).  Furthermore, GALEN offered no evidence of any instances wherein COMTA did not know Connecticut law nor failed to compare the law to the COMTA's standards.  His own testimony belies the arguments advanced by GALEN in its Trial Memorandum.

OSTENDORF was at the time of the GALEN site visit, the Team Leader. Evidence shows that OSTENDORF had an extensive educational and employment background as to more than qualify to act in such a capacity.  OSTENDORF has a bachelors of science degree in physical therapy, one masters degree in business administration and another in clinical neuroscience, and a doctorate in educational psychology (OSTENDORF testimony 5/16/05 9:04 a.m.).  Furthermore, OSTENDORF had taken two institutions through the process of accreditation successfully, prior to the GALEN site visit (OSTENDORF testimony 5/16/05 9:05 a.m.).  OSTENDORF presently is the Chief Financial Officer and Director of Education at Lakeside Contemporary Health Services Corp. where she is responsible for curriculum and curriculum development faculty, including the supervision of 32 staff members, and all financial

12

matters of Lakeside (OSTENDORF testimony 5/16/05 9:02 a.m.).  Therefore, In her current position, OSTENDORF is familiar with and, in fact, reads and reviews financial reports.   Accordingly, OSTENDORF was duly qualified to act as team leader of the site team.

OSTENDORF selected the site team members (OSTENDORF testimony 5/16/05 9:24:17 a.m.).  GALEN could and, in fact, did disqualify a number of potential team members, but raised no objection to the team ultimately selected. OSTENDORF specifically chose Dee Meux, Brenda Griffith and Michele Minch because of their qualifications background and experiences.

Brenda Griffith was chosen as the Education Specialist because of her extensive background as a certified massage therapist with seventeen years experience. (Griffith testimony 5/12/05 9:02:07 a.m.).  Griffith also has significant teaching experience which is not limited to new students, but also involved continuing educational instruction, wherein she taught experienced massage therapists as well. (Griffith testimony 5/12/05 9:03:19 a.m.; OSTENDORF testimony 5/16/05 9:25:54 a.m.).   Griffith was initially trained at a COMTA workshop in 1998 and, in fact, attended a second workshop. (Griffith testimony 5/12/05 9: a.m.).   Prior to GALEN, Griffith had participated in four site visits.  Griffith received the GALEN SSR and reviewed same prior to site visit. (Griffith testimony 5/12/05 9:05:58 a.m.).

Dee Meux was chosen as the Management Specialist because of her experience as the Assistant Director of the Mississippi School of Therapeutic Massage.  As such, Meux has extensive experience in the business operations of a massage school. In addition to her duties at that institution,  Meux also had three years of college training in

13

business and furthermore had taken a school of similar size as GALEN'S Wethersfield campus through the accreditation process. (OSTENDORF testimony 5/16/05 9:24:33 a.m.). As such, Dee Meux possessed the necessary qualification to perform the duties of a management specialist on the site visit.

Michele Minch was chosen as the Content Specialist because she is a practitioner with ten years experience performing the equivalent of what is referred to as "medical massage therapy." Furthermore, her practice, located in Washington, has stringent standards, which Minch herself had a role in setting. Thus, Minch was particularly qualified to evaluate the content of GALEN'S medical massage program. (OSTENDORF testimony 5/16/05 9:26:45 a.m.).

In addition, OSTENDORF as Team Leader was responsible to back up the team members. Therefore, if an individual member was having difficulty verifying a particular standard, OSTENDORF would provide assistance (OSTENDORF testimony 5/16/05 9:25:20 a.m.). As such, the four members of the site team which visited GALEN demonstrated the necessary qualifications and expertise to perform their tasks, and GALEN'S claims, in this regard, are without merit.

### E.    GALEN DID NOT MEET COMTA'S STANDARDS

Throughout four days of testimony, LATTANZIO claimed that the Connecticut DPH continued to authorize GALEN'S operation. GALEN then attempts to argue that this is evidence that COMTA failed to properly apply its standards. This argument has no merit; first, because DPE did express many of the same concerns articulated by COMTA in its site report. The areas of overlapping concerns will be addressed in greater detail below. Secondly, the evidence presented clearly demonstrates that DPH

14

does not accredit schools. (LATTANZIO testimony 5/3/05 2:28:30 p.m.). Furthermore, COMTA standards for accreditation can and do exceed state requirements for authorization. (LATTANZIO testimony 5/3/05 4:57:22 p.m.). As such, any claims that the DPH had approved GALEN'S program are misleading if not downright false. To the extent the DPH did authorize GALEN, this fact remains irrelevant to the issue of whether or not GALEN met the higher standards for accreditation imposed by COMTA.

LATTANZIO testified that he, himself, would not have granted authorization to GALEN based upon the contents of the site report. (LATTANZIO 5/10/05 12:51 p.m.). Throughout his lengthy testimony, LATTANZIO repeatedly testified regarding the ways in which COMTA violated its own policies and procedures, holding himself out to be knowledgeable in their application. Yet, on direct examination, LATTANZIO admitted that he was "not that versed in the expertise of what COMTA allows." (LATTANZIO testimony 5/10/05 10:19:18 a.m.). Further examination of LATTANZIO'S testimony reveals the following admissions in which LATTANZIO/GALEN admit COMTA's standards were not met:

### i.    STANDARD 1.0 MISSION & OBJECTIVES, INCLUSIVE

LATTANZIO testified that the mission statement was published and available to COMTA before or during the site visit. However, this testimony is directly contradicted by GALEN's response to the site visit report dated May 17, 2002. Specifically, GALEN responds as follows: "The mission statement within the SSR has been posted, added (emphasis added) to the catalogue and has been provided to all staff and students." (Plaintiffs' Exhibit 19, Page 1). As such, the reasonable conclusion is that the mission statement was not in the catalogue that was available to COMTA at or before the site

15

visit.   Therefore, COMTA's finding that "The mission statement is written, but not included in the school catalogue or otherwise published" is consistent with GALEN's admission in the response to the site report.   Therefore, GALEN's receipt of a no with respect to Standard 1.0, more specifically "Mission statement is published" is supported by the evidence and COMTA was justified in finding GALEN did not meet this standard.

**ii.     STANDARD 2.2: CURRICULUM AND STANDARD 3.2: COMPREHENSIVE COURSE OUTLINES AND SYLLABI EXIST**

Standard 2.2 encompasses a number of facets of GALEN's curriculum, including clock hours and the many necessary elements of educational content.   GALEN's attempt to challenge COMTA's findings with respect to this standard is not supported by the evidence nor are its arguments based on logic.  In GALEN's trial memorandum, it attempts to argue that because COMTA admits to reviewing course syllabi and lesson plans, their findings with respect to the lack of syllabi and lesson plans are inherently inconsistent and, therefore, a violation of policy.  This is a distortion of logic. The fact that some syllabi and lesson plans were reviewed does not mean that each class had one, nor more importantly that COMTA was provided a syllabi or lesson plans for each class.   COMTA's findings, with respect to this standard, specifically revealed that : "Some (emphasis added) classes don't have detailed syllabi and a syllabus does not exist for Kinesiology."  (Plaintiffs' Exhibit 19, Page 6; Griffith testimony 5/12/05 9:22:28 a.m.).  It is therefore entirely consistent for COMTA to note that syllabi were reviewed, while also finding that GALEN did not meet this criteria since GALEN did not provide syllabi for all classes offered.  GALEN did not introduce evidence as to the existence of syllabi for each class and more importantly, GALEN cannot now show this court a

syllabus for Kinesiology.  GALEN's claim that COMTA violated its policies in failing to verify standard 2.2 is therefore lacking any merit and should be rejected.

### iii.     STANDARD 2.4: CURRICULUM REVISION INCLUDING STUDENT INPUT

Standard 2.4 requires evidence that the curriculum is periodically revised and that students, graduates, and employers are utilized in the process.  COMTA's site team found that "Grads, students, and employers are not used in the process because the Director states they aren't capable of contributing information."  (Plaintiffs' Exhibit 18, Page 7).  This finding of COMTA is fact supported by testimony given by LATTANZIO wherein he testified that "we may or may not have met this standard." (LATTANZIO testimony 5/5/05 12:41:19 a.m.).  He further testified that GALEN accepted "some of these findings of problematic area."  (LATTANZIO testimony 5/5/05 10:36:50 a.m.).  LATTANZIO later confirmed that GALEN does not utilize graduate input in the "direct revision" of the curriculum. (LATTANZIO testimony 5/10/05 2:43:40 p.m.).  Therefore, GALEN has not met the required criteria of standard 4.3 and COMTA's negative findings with respect to this standard are based upon clear and uncontroverted evidence.

### iv.     STANDARD 2.8: CLOCK HOURS

Galen failed to meet Standard 2.8 with respect to clock hours.  COMTA attempted to establish that the requisite number of clock hours were being met by GALEN's graduates through class room observation, faculty and student interviews and review of student and graduate records.  COMTA was unable to do so through these methods.

17

A clock hour is a 60 minute block in which there must be instruction for 50 of those 60 minutes. This is to ostensibly allow for breaks so that students can stretch, utilize the restrooms and otherwise take a break in order to facilitate the task of concentrating on the learning objectives. Classes at GALEN were each four hours in duration; day classes ran from 9:00 a.m. to 1:00 p.m., five days per week and its evening classes ran from 6:00 p.m. to 10:00 p.m., four days per week. (LATTANZIO testimony 5/3/05 12:44:35 p.m.). LATTANZIO testified that the student records reflected these four hour blocks and needed to be "converted" to meet the definition of clock hour as noted above. GALEN therefore conceded that the records, as provided to COMTA, did <u>not</u>, on their face, demonstrate the necessary clock hours for accreditation. (OSTENDORF testimony 5/16/05 9:34:13 a.m.).

GALEN attempts to creatively interpret the definition of a clock hour to argue that a student is entitled to receive 1.2 hours of credit for every hour of class. There appears to be no evidence in support of this statement aside from the testimony offered by LATTANZIO. However, this argument advanced by plaintiffs appear to be a recently created interpretation offered solely for the purpose of  misleading this court in the present litigation. When GALEN responded to the site report on May 17, 2002, GALEN did not raise this "conversion" explanation but, instead, contested COMTA's findings as follows:

> "In our program description we clearly state our clock credit hour. It is exactly the same as the state statutes and COMTA standard. ALL GALEN graduates have successfully completed our program reasonably and adequately achieves the stated objectives for which the program is offered. An indisputable 97% pass rate bears this out."

(Plaintiffs' Exhibit 19, Page 1).

18

This "conversion" argument is not consistent with COMTA's standards (OSTENDORF testimony 5/16/05 9:34 a.m.). The attempt by GALEN to explain away the clearly demonstrated lack of clock hours is unpersuasive. The purpose of a clock hour is to allow for breaks so that students will not be required to sit in rapt attention for four straight hours. There are naturally periods of waning concentration during a four hour lecture and it is therefore conducive to the learning process to allow students an opportunity for diversion to prevent their attention from wandering during the lecture. Classroom observation by the site team revealed that breaks were, in fact, given to the students (OSTENDORF testimony 5/16/05 9:35: a.m.).

GALEN again claims that continuing DPH approval of its program evidences COMTA's lack of compliance in applying its standards. Yet, GALEN's underlying assumption, i.e. DPH's approval is belied by the evidence. DPH was also present during March 2001 for GALEN's annual inspection for reauthorization. DPH was also present during the first day if the COMTA site visit. DPH also found discrepancies in the students clock hours. LATTANZIO admitted during cross examination that state inspectors found that instructors arrived late and ended class early. (LATTANZIO testimony 5/10/05 2:24:27 & 2:24:34 p.m.). These concerns noted by DPH calls into question GALEN's explanation of "wall clock hours" and the validity of GALEN's conversion theory. If a class starts late, ends early and allows students a break, then the classroom instruction is necessarily less than four hours, and applying GALEN's conversion formula is a clearly inappropriate. This was but one of several reasons why GALEN was issued a probationary certificate of authorization by DPH in April 2002. (LATTANZIO testimony 5/3/05 12:27:40 p.m. and 12:48:00 p.m.) As such, there is

19

more than ample evidence to disregard GALEN's attempt to bolster its program through

DPH approval and to conclude that GALEN failed to meet Standard 2.8

**v.    STANDARD 2.9: PROGRAMS ARE DESIGNED TO PREPARE STUDENTS TO FULFILL ALL CREDENTIALING REQUIREMENTS**

COMTA could not verify this standard as the evidence demonstrated that

COMTA was advised by DPH representatives that "GALEN graduates <u>are not currently</u>

(emphasis added) eligible for licensure due to the school being out of compliance with

State regulation." (see plaintiffs' exhibit 18, pg 11). The record is replete with evidence

which demonstrates the fact that GALEN had significant difficulties with the Connecticut

DPH throughout 2001 and 2002. DPH is the governing agency that issues the

necessary certificate of authorization which allowed GALEN to operate as an

occupational school.  LATTANZIO testified that Brenda Lerner of the DPH had on two

occasions, March 2001 and March 2002, reviewed GALEN's program and found

significant problems with it.  (LATTANZIO testimony 5/3/05 11:51:59 a.m. and 12:27:40

p.m.)   In fact, in April 2002, GALEN was issued a probationary certificate of

authorization by DPH which required significant changes in order for GALEN to receive

unconditional authorization.   The negative findings of the DPH resulted in a federal

lawsuit brought by LATTANZIO and GALEN alleging many of the same complaints as

brought in the present case.  It is no coincidence that the events complained about in

the lawsuit against DPH employers occurred during the COMTA accreditation process.

GALEN offered no evidence to dispute COMTA's belief that as of March 25,

2002, its graduates were then eligible for licensure.  Furthermore, GALEN has offered

no evidence to refute the fact that COMTA was advised by state officials prior to the site

visit that GALEN's graduates were not eligible for licensure. Rather, GALEN contends that it was advised on May 14, 2002, a month and a half after the site visit, that its graduates were then eligible for licensure (Plaintiffs' Exhibit 19, page 2). Therefore, GALEN contends that COMTA violated its policy by finding GALEN did not meet this standard. This argument is unsupported by logic. Evidence of the May meeting between GALEN and Jan Cordero confirms that a question of eligibility existed at or around the time of the site visit. Where GALEN's argument fails is in the fact that the position communicated to it in May 2002 by DPH is irrelevant to the knowledge COMTA may or may not have possessed in March 2002 when the site visit occurred and the report was completed. GALEN therefore has failed to demonstrate that the negative finding with respect to standard 2.9 was unsupported by information made available to COMTA nor that COMTA violated any policy or procedure in reaching its conclusion.

### vi.    STANDARD 3.0 METHODS, MATERIALS, AND FACULTIES, INCLUSIVE

GALEN failed to meet this standard pursuant to testimony of Brenda Griffith, LATTANZIO and documents offered by plaintiffs. Griffith testified that the restrooms were not suitably equipped to provide access to handicapped individuals. (Griffith testimony 5/12/05 9:11:45 a.m.). Specifically, there were no hand rails to allow for a handicapped individual to maneuver from their chair to the facilities. (Griffith testimony 5/12/05 9:12:09 a.m.). Plaintiffs contested Griffith's testimony by demonstrating that she is not an engineer. However, one need not be an engineer to read a tape measure. Griffith's testimony is supported by the fact that her husband is handicapped and confined to a wheelchair. As such, Griffith has first hand knowledge of the challenges

921971.1

that handicapped individuals face and is more than qualified to discuss the restrooms lack of accessibility to such individuals.

Furthermore, Griffith testified that her tour of the facilities revealed 12 massage tables rather than 13 as listed in the SSR. (Griffith testimony 5/12/05 9:11:28 a.m. & 9:12:43 a.m.). This fact was admitted by LATTANZIO. (LATTANZIO testimony 5/5/05 1:02:59 p.m.). COMTA also found that the facility itself was small and that students were crowded (Griffith testimony 5/12/05 9:11:08 a.m.). Again, GALEN's efforts to invoke DPH approval of its program is not based on facts. LATTANZIO admitted during cross examination that state inspectors found that there was a lack of chairs. (LATTANZIO testimony 5/10/05 2:24:27 p.m.). This finding is further supported by a letter received from DPH by GALEN on or about April 4, 2001. GALEN admits that DPH reported that students were found to have been utilizing massage tables to write upon and were also reported to have to search for chairs. (LATTANZIO testimony 5/10/05 2:12:05 p.m.). GALEN offered no evidence to challenge these findings. As such ample evidence exists to find that GALEN did not meet COMTA standard 3.0. and reliance on "DPH authorization" is misplaced.

GALEN attempts to argue that COMTA violated its polices with respect to standard 3.0 as evidenced by an inconsistency in the number of faculty and students interviewed by Griffith (GALEN trial memorandum page 28 § d). This is a distortion of the evidence presented and another example of the tortured logic plaintiffs' utilize in an attempt to mislead the court. GALEN argues that Griffith's testimony regarding her interviews of two faculty members is inconsistent with the site report which indicated there five faculty interviews conducted. GALEN never offered any evidence that any

more or less than five faculty members were interviewed, this, despite the fact that GALEN's witnesses list named eleven current and former staff members. Furthermore, Griffith never testified that she only interviewed two witnesses, nor did she testify that she conducted all five. Griffith testified as to the two interviews that she was asked to testify about; no more, no less.

Standard 3.0 was the primary responsibility of Brenda Griffith; however, each of the other team members had back up responsibilities for each of the standards. GALEN did not offer evidence that contradict the site report statement that five instructors were interviewed by Griffith <u>or any other</u> member of site team. GALEN's arguments in this regard are therefore unpersuasive.

### vi.    STANDARD 3.3 DIVERSE LEARNING METHODS

LATTANZIO'S testimony reveals he did not even understand this particular standard at all. When inquired of him on direct testimony, LATTANZIO attempted to offer evidence as to ways in which GALEN met the diverse learning styles standard. In support of GALEN's challenge of this particular finding of COMTA, LATTANZIO offered the fact that GALEN had contracts with the state with respect to the training of injured workers and welfare recipients and other students of diverse backgrounds. (LATTANZIO testimony 5/5/05 2:14:13 a.m.). It appears GALEN believed the standard was met by educating students of diverse backgrounds and experience. The standard however ever requires diverse learning <u>styles</u>. Evidence introduced by OSTENDORF demonstrated there are three learning styles: visual, auditory and kinesthetic. In essence, each student learns primarily by either seeing, hearing or doing. These learning styles are defined in COMTA policies and procedures, which GALEN was in

921971.1

possession of as early as 1999. (Plaintiffs' Exhibit 1, appendix c, page c9). The fact that LATTANZIO does not understand this, calls into question his knowledge and familiarity with the polices to which he, himself, has testified to at length.

The standard, therefore, requires that the institution incorporate various methods to ensure that students in each of these categories are considered in lesson plans. GALEN offered no evidence that its teaching methods consider each of these ways in which student absorb and process information. LATTANZIO's lack of understanding regarding this standard is apparent and borne out by his admission that "We may or may not have met 3.3." (LATTANZIO testimony 5/10/05 2:45:00 p.m.) As such, COMTA's conclusion that standard 3.3 is supported by the evidence and not in violation of COMTA policies.

### viii.   STANDARD 4.0: FACULTY MEMBERS ARE ACADEMICALLY AND PROFESSIONALLY QUALIFIED

COMTA was unable to verify that all the instructors were qualified to teach the courses for which they were conducting. GALEN admits that Beth Hoffner did not have a degree in sciences, yet, taught anatomy and physiology. GALEN argues that COMTA should disregard this lack of a science degree. Rather, GALEN contends that COMTA should have looked at Hoffner's students' NCE test results; in particular, the anatomy and physiology portion as evidence of her qualifications. It is plaintiffs' position, that had COMTA done that, they would have found high test scores, thus evidence that Hoffner was qualified to teach despite her lack of the necessary degree. (LATTANZIO testimony 5/5/05 2:30:50 p.m.). However, these test results were never specifically provided to COMTA. (LATTANZIO testimony 5/5/05 2:32:48 p.m.).

24

Instead of providing COMTA with the test results for Hoffner's students in its response to the site report, GALEN responded as follows: "Working at GALEN Institute provides professional development opportunities in a field in which <u>we set</u> (emphasis added) the only standards." (Plaintiffs'Exhibit 19, page 2). This statement clearly expresses GALEN's belief that they did not have to meet COMTA's standards and explains why numerous efforts by COMTA to assist GALEN were repeatedly rejected as will be discussed above.

In addition, Griffith reviewed faculty files in an effort to verify standard 3.0. The review of faculty files also overlapped standard 4 for which Griffith had back up responsibilities. (Griffith testimony 5/12/05 9:17:00 a.m.). Many were files missing evidence of continuing education of instructors and lacked evidence of in-service training provided to faculty. (Griffith testimony 5/12/05 9:17:47 a.m.).

Graduate surveys were reviewed which also raised concerns voiced by GALEN's graduates that the teachers lacked the necessary skill sets. (Griffith testimony 5/12/05 9:37:00 a.m.).

Again, GALEN's claim that DPH continued to authorize it to continue operations and, therefore, it was COMTA who failed to correctly apply its standards is not supported by the evidence. DPH did, in fact, express the same difficulties in verifying that GALEN's teachers had current licenses or any licenses at all. (LATTANZIO testimony 5/10/05 2:23:50 p.m.).

### ix.    STANDARD 4.3: ORIENTATION

GALEN did not meet the criteria for standard 4.3 due to the inadequate orientation procedures in place at the time of the COMTA site visit. COMTA interviewed

faculty members who commented that "their orientation included a tour by the director, they were given a key, textbooks and course materials." (plaintiffs' exhibit 19, page 23). An interview of David Priest conducted by Griffith confirms this finding. (Griffith testimony 5/12/05 9:32:27 a.m.).   An examination of the standard finds that COMTA requires that "Schools provide instructors with orientation to their instructional responsibilities and with written job descriptions that include clear and accurate performance objectives." (Plaintiffs' Exhibit 19, page 23). As such, COMTA was not able to verify this standard.

GALEN argues that COMTA's findings were inconsistent with statements made to LATTANZIO by the faculty.   LATTANZIO testified that after he received the site report, he inquired of the faculty what statements were made to COMTA with respect to orientation procedures.   He claims staff reported that the above description reported by COMTA was not all that was told to COMTA by the faculty.   This again appears to be a recent fabrication created to sway the opinion of the court.   At trial, LATTANZIO testified that he reported the alleged mistaken findings contained in the site report in GALEN's May 17, 2002 response to the site report. (LATTANZIO testimony 5/5/05 2:41:19 p.m.).   However, on cross-examination, LATTANZIO was offered the opportunity to demonstrate where within GALEN'S response that challenge was communicated to COMTA. He was unable to do so. Rather, he claimed GALEN's response "was a generic reply to standard 4.0. Did it specifically it specifically state 4.3 that we met that standard? No it does not." (LATTANZIO testimony 5/5/05 2:55:33 p.m.). Furthermore, GALEN'S April 9, 2004 Trial Preparation Order, listed some 23 witnesses, of which,

26

eleven of were former or current members of the faculty.   Not one of these eleven potential witnesses were called to support LATTANZIO's claim.

### x.    STANDARD 5.2: ADMISSION POLICIES

COMTA was able to confirm that GALEN had published accurate admissions procedures within its catalogue but were they were unable to verify standard 5.2 with respect to GALEN's compliance with their own admissions policies.   GALEN argues in its trial memorandum that COMTA verified that all students "had a high school diploma or its equivalent" but cannot understand why GALEN received a negative rating for this criteria. (GALEN Trial Memorandum, page 29).    One need only examine the commentary provided in the site report, for the answer.   COMTA indeed found that student files contained high school diplomas or their equivalent but issued a negative rating because "2 out of 5 files in one class did not contain medical information required by the school." (Plaintiffs' Exhibit 18, page 25; Griffith testimony 5/12/05 9:16:01 a.m.). LATTANZIO admitted on cross examination that the DPH in March 2002 also could not locate the required health forms in the student files of Danielle Connelly-Fellows, Rochelle Mielec, Sal Minero, and David Hoffman. (LATTANZIO testimony 5/10/05 2:21:00 p.m.; 2:21:23 p.m.; 2:21:43 p.m.; 2:22:21 p.m.).   Ample support therefore exists for COMTA to conclude that GALEN did not comply with its own stated admissions requirements and therefore did not meet this standard. GALEN does not address this point in its brief and no evidence was offered to refute this particular finding of COMTA. Additionally, GALEN's attempted offer of DPH approval is unsupported by fact and should be disregarded. GALEN's contention that COMTA violated its policies in issuing a negative rating with respect to standard 5.2 is without merit.

921971.1

### xi.    STANDARD 5.3: TRANSFER OF CREDIT POLICY

COMTA's standards with respect to transfer of credits from other institutions

clearly state that:

> "Institutions and programs that accept transfer credit establish and consistently implement policies that specify:
> 1) the educational criteria guiding the acceptance of transfer credits;
> 2) the maximum number of transfer credits that can be accepted toward completion of an accredited program;
> 3) the procedures that will be followed in determining whether to accept work completed at other institutions."

(Plaintiffs' Exhibit 18, page 27).

LATTANZIO testified that the GALEN transfer of credits policy was contained in

The GALEN handbook that was provided to COMTA. (LATTANZIO testimony 5/5/05

3:05:32 and 3:06 40 p.m.).  COMTA received a catalogue, (defendants' exhibit I), during

the site visit (OSTENDORF testimony 5/16/05 9:41 a.m.). A review of the statement

concerning transfer credits contained in the GALEN handbook for 2001 – 2002, reveals

the following policy:

> "Students who wish to transfer into one of our training programs from another school first will have to make formally application. A certified grade transcript directly from that school they attended must be provided. GALEN will evaluate each course for content hours and knowledge gained.  The credit value, if given will be solely and completely at our discretion."

(defendants' exhibit I, page 6 ).

This does not meet standard 5.3 as nowhere within the written GALEN policy can

one reasonably find that educational criteria, maximum number of credits, nor

procedures in which credits are evaluated are specified as required by the COMTA

standard.  (OSTENDORF testimony 5/16/05 9:48:43 a.m.; plaintiffs' exhibit 18, page

27).   Neither LATTANZIO, nor GALEN offered any evidence that any other policy

regarding transfer credits existed at the time of the COMTA site visit, nor that said other policy or policies were provided to COMTA at any time. As such, the evidence demonstrates that GALEN did not meet COMTA standard 5.3.

### xii.   STANDARD 5.5: CATALOG REQUIREMENTS

The findings of COMTA with respect to GALEN's catalogue are somewhat overlapping with respect to other standards. For example, COMTA found that students were not receiving 600 in class supervised hours of instruction as noted in discussion above. GALEN received a negative rating since the catalog promised 600 hours and COMTA was unable to verify that they even received the DPH imposed minimum of 500. (Griffith testimony 5/12/05 9:16:28 a.m.). Likewise COMTA found that GALEN did not publish the mission statement within the catalog itself as noted earlier. As such, the catalog did not meet the standards articulated in standard 5.5 and GALEN's claim that COMTA violated policies with respect to this standard is not supported by evidence.

### xiii.   STANDARD 5.6: STUDENT COUNSELING SERVICES

COMTA standard 5.6.1 requires accredited institutions "have a mechanism in place to refer students to an appropriate professional." (Plaintiffs' Exhibit 18, page 30). No such mechanism was observed by COMTA evaluators, either in the SSR materials or during the site visit. LATTANZIO testified as to the lack of such referral mechanism on direct testimony. (LATTANZIO testimony 5/5/05 3:27:00 p.m.). He testified that because a referral system is not listed in the catalog, that COMTA misinterpreted this criteria in evaluating this standard. It is GALEN, however, who has misinterpreted this standard. What GALEN fails to realize is that the standard noted above requires that mechanism be in place. One criteria utilized to verify this standard is to examine the

29

program description in the catalog to ensure the program and services available are in compliance with COMTA standards. The lack of evidence in the catalog and his admission that "We just don't do that" (LATTANZIO testimony 5/5/05 3:27:00 p.m.) are both clear evidence that GALEN did not provide student counseling services in direct violation of COMTA standard 5.6.1.

### xiv. STANDARD 6.1: POLICIES CONFORM TO THE USDE DEFINITION OF SATISFACTORY PROGRESS

COMTA standard 6.1 requires that "Policies regarding student completion and evaluation conform to the USDE definition of satisfactory progress." (Plaintiffs' Exhibit 18, page 31). GALEN conceded on direct examination that it did not meet this requirement as testified to by LATTANZIO. (LATTANZIO testimony 5/5/05 4:00:50). As such, GALEN did not meet COMTA's standard 6.1.

### xv. STANDARD 6.2: COMPLETION STANDARDS

COMTA found that instructors were inconsistent in implementing completion standards. One such example is the fact that identical exams were being given as a take home test by one instructor whereas another instructor offered the test as an in-class exam. (OSTENDORF testimony 5/16/05 9:33:25 a.m.). Accordingly, one group of students would have both a longer time period in which to work on the examination and would also have the opportunity to conduct research and consult other resources. GALEN never denied this fact nor offered evidence to challenge this specific finding. Therefore, the record supports COMTA's negative rating in respect to standard 6.2.

### xvi. STANDARD 6.3: PERFORMANCE STANDARDS

921971.1