UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2005 JUL 21  P 1: 41

U.S. DISTRICT COURT

GALEN INSTITUTE, LLC ET AL    )    DOCKET NO. 3:02CV1232(PCD)

v.    )

COMTA ET AL.    )    JULY 18, 2005

## REPLY TO DEFENSE PROPOSED FACTS

The plaintiff James Lattanzio in the above-entitled action hereby submits his reply to defense proposed facts.

1.  The common thread that runs through all case law decisions concerning Federal lawsuits involving Federally recognized accrediting agencies brought in many Districts including this one, is that, and the Courts have consistently ruled, "The accrediting agency must follow all of its own written and stated "policies and procedures" and must not apply any of its "standards" arbitrary or with caprices. This Court stated in the opening testimony of the plaintiff's witness James Lattanzio when allowing him to testify in the narrative; "If the facts show that the defendants did not follow their "policies and procedures" then the plaintiff is entitled to prevail." To that end, I would like to remind this Court, respectfully, despite the defendants main theory, this matter is not based on the defendants decision to deny accreditation to the plaintiffs almost a year after plaintiffs filed this law suit, but the pure established law that establishes that; "The accrediting agency must follow all of its own written and stated "policies and procedures" and must not apply any of its "standards" arbitrary or with caprices. This Court should also conclude that at the point in time when an accrediting agency fails to apply or follow its "policies and procedures" or its

"standards" or applies either in an arbitrary or caprices manner, the accreditation process is invalid. The most compelling support for the plaintiff <u>invalidation</u> claim is that the written policy of the defendant calls for the very same conclusion.

2.  The production of <u>any</u> defense theory that, "because the plaintiff Galen was denied accreditation on April 1, 2003, and therefore Galen did not meet the accrediting agencies standards, should be flatly rejected by this Court. Because this plaintiff simply floats the plausible theory that, "Galen was ultimately denied by the defendants, long after Galen withdrew, (May 21, 2002) and the filing of the law suit (July 18, 2002), to <u>create a defense</u>. The defendants knew they were facing a Federal lawsuit, so simply deny Galen and say, "Galen has no claim because they were denied." This plaintiff submits that this Court should not go through a long and speculative "he said she said" process to determine if the plaintiff Galen should or should not have been accredited. In addition, that is not a defense of merit. What is at issue here is, did the defendants follow <u>all</u> of its own written and stated "policies and procedures" and apply its "standards" arbitrary or with caprices. The so-called valiant acts of the defendants to provide "assistance" past May 21, 2002 and July 18, 2002 are irrelevant. The policies and procedures of the defendant-accrediting agency are irrelevant past the point in time at which the plaintiff Galen Institute withdrew (May 21, 2002), after detecting that the defendants did not "live up to <u>their</u> part of the bargain," except that the accrediting agency continued not to follow them. This Court should not conclude, nor does it have to, that Galen should have continued to follow the accrediting agencies policies, (the so-called contradicting withdrawal policy), after a breach. Even after an alleged breach of policy, or

complaint thereof, the accrediting agency has a written procedure to follow. By the testimony of plaintiff and defense witnesses, the defendants did not even follow that, even after being sued. No, they testified, "that was not a complaint, it was a "concern." Galen's very strong written withdrawal and then the Federal lawsuit was not a complaint. The defendants upon cross examinination stated, "they have no policy or procedure for concerns." This was just another "invented" lame excuse for not following their policies. Also, if the defendants expected Galen to "follow" their policies, then Galen could expect the same. The facts as presented in this case overwhelmingly show that it was the defendants that failed here.

3. In this matter we have several "factors" that also have to be applied concerning the accrediting process in Connecticut and the accrediting agency itself. The first being, in the State of Connecticut, accreditation is mandatory. The second being, the accrediting agency was not federally recognized during the time of its alleged misconduct, however had been pursuing Federal recognition and was granted such in July 2002. These above two factors are relevant in this matter because, 1. Federal Law calls for accreditation by a recognized agency must be a voluntary process. 2. The defendant-accrediting agency to be "Federally recognized" in July 2002, must have previously certified to the U.S. Department of Education in its application, that it complies with all requirements under Federal law which included all times during the accrediting process it conducted with the plaintiff Galen Institute. The defendant-accrediting agency was therefore legally obligated to apply and follow the law as well as all their written and stated "policies and procedures" and its "standards."

4. There has been ample and compelling evidence (documents and testimony) presented by the plaintiff's to find as fact that the defendants did not apply or follow the law as well as many of their written and stated "policies and procedures" or its "standards." There has also been ample and compelling evidence in the form of "accreditation documents, contradictions and illogical conclusions" on the part of the defendants in the presentation of their case via their defense witnesses.

5. The defendants had only <u>one</u> of the three-onsite team members (Brenda Griffith) testifying and her testimony severely contradicted the policies and procedures and standards. The Griffith testimony repeatedly contradicted the onsite report; she supposedly co-authored, but then testified she never read the final report. The Griffith testimony directly and repeatedly contradicted the testimony of Carole Ostendorf, the then executive director of the defendant accrediting agency and the onsite team leader. Griffith testified that she talked with "<u>so</u> many people." Then under cross Griffith testified that she only talked with two people. Ostendorf testified that she witnessed Griffith called employers and graduates from Galen. Griffith testifies she called no one. Griffith testified that she handed her hand written notes to Ostendorf to be typed into the onsite report. Ostendorf testified that Griffith typed in Griffith notes. The only other defense witness, John Goss, the CEO and Chief commissioner of the defendant agency contradicted both Griffith and Ostendorf as to defendant policies, procedures, standards and agency operations. In one breath, the defense claims as their meritorious defense that it was Galen that did not meet the agency standards, then all three defense witnesses contradicted each other as to how those standards are even applied, let alone how then cay be met. The

defendant's executive director Ostendorf directly contradicted the CEO as to many of the policies and ratings needed to determine that a standard was or was not met. This plaintiff submits to this Court that if the defendant's witnesses, the executive director, the CEO, chief commissioner and an onsite member do not understand their policies and procedures then they also cannot make a valid claim that Galen did not meet them.

6. What the defense represents as providing assistance to Galen is <u>one</u> request for Galen to assist the defendants, from Steven Fridley, the agencies so-called "accreditation project specialist." Hired January 2001, two months before Galen attends the accrediting workshop. Ostendorf, when caught in a lie on cross, after stating Fridley was hired in January 2000, recanted after plaintiff Lattanzio read her a press release that she then admitted writing. The article, published in June 2001, read that once Fridley was fully trained, (in June 2001, Fridley was not yet trained), he would be assigned to help schools. Testimony also shows, Fridley had absolutely no educational or accrediting background whatsoever. Fridley was assigned to "assist" Galen August 5, 2001. Fridley was present in the Courtroom during the trial, but was not called as a witness to refute any of this evidence. It was Ostendorf who also contradicted Goss in inventing the "concern" policy, contrary to the Goss explicit "only complaint" policy that the agency had in place. Now defendants claim that "complaints" only cover accredited schools and therefore any complaint from Galen is invalid. That's not what Goss and Ostendorf testified too. Ostendorf also testified that defendants hold themselves to all the policies and procedures, even he policies and procedures that the accredited schools must follow. Interesting, that when Goss

was not present, this Court established that defendants were in fact supposed to provide help and assistance to schools, to which Goss testified, they were not.

7. The bulk of the defenses proposed facts are irrelevant, laced with inaccurate theories based on so called evidences, most of which is testimony quoted out of context to the manner in which it was said. The illogical conclusions are contradictions to the actual documents and evidence that was given. The defendants brief also attempts to raise add hoc defense theories that were never presented trial by "fitting" their witness testimony into a policy and practice, that in fact don't exist. The Court should quickly see through this poor attempt. The defense so-called meritorious defense was not proffered at all-but for a rehash of the testimony and evidence rewritten in their distorted view.

A. Galen's sole purpose in seeking accreditation is irrelevant. The fact is, it is a law in Connecticut and if Galen had become accredited it would have complied with Connecticut law and have had access to Federal funding for its students. The defense theory that Galen withdrew only after a "perception" that accreditation was not needed is then contradicted by their theory that a new accrediting agency, COMMTA accredited Galen. If accreditation was not needed, then why COMMTA accreditation. The testimony of Lattanzio shows that Galen withdrew from accreditation because of the conduct of the defendants and the "onsite report," which was mailed and received well before received any information from the Department of Public health. Galen knew by the conduct of the onsite members and then the "comments" within the report that the defendants were a sham or they had an ulterior motive. Evidence does clearly show that defendants used some pretty sleazy tactics after the fact to close Galen down as a

massage school. The subsequent conduct of the defendants is further verification that

Galen made the right choice, which was to terminate the relationship when it did. There

was no evidence presented regarding the quality if COMMTA or any lack of its abilities.

The evidence that was presented stated that COMMTA did not use "standards" like the

defendants but legitimate meaningful criteria. The Galen accountant did not form

COMMTA, as public record from the City of Hartford can verify that Terrance Jacob past

away July 2001. In addition, public record from the Secretary of the State will also show

that COMMTA, LLC and COMTA, LLC were both legally formed in Connecticut in June

and July 2002 respectively, which also has absolutely no bearing on this issue. The

defendants simply do not have the facts right and have misquoted testimony and

represented issues out of context.

B.  Galen was not the sole cause of delays. The ultimate decisions in all matters regarding

accreditation are solely based on the defendant's timetables and their accreditation

criteria. The policies and procedures and the actions of the defendants bear this out.

The defense tries to confuse this issue by claiming something totally outside this realm.

There theory here is littered with statements, dates and times that are supposed to

elude too and support a delay caused by Galen. However the simple undisputable fact,

which the evidence supports is that the defendants policies state that "to have your

application brought before the commission for an accreditation decision on April 1, 2002

the schools SSR needs to be submitted by October 1 2001," which Galen did. All

evidence and testimony support this. The "application" the defense harps on is

irrelevant to the SSR except that according to defendant's policies, the application must

be submitted and then "approved" by defendants, which it was, prior to submitting the

7

SSR. There is no evidence that the defendants ever notified Galen that time was an issue. In fact, the defense "accreditation project specialist," Fridley in a written communicated to Galen, in November, that "in order to have your application before the commission, we need the following additional information." One very important fact and written policy of the defendants is that they will apply State law, if it exceeds or is in conflict with their policies. The law in this State also requires the defendants, when doing business in this State to also comply with the law. If the defendants were not able to take Galen through the process within the law timeframe, then the defendants were obligated not to accept Galen's application or its money for its services. Furthermore Ostendorf testimony "20 students from the longest *accredited* program" is not what the policies and procedures, "criteria for accreditation" state. The word *accredited* is not in the written policies. Ostendorf lied in her testimony to help counsel create this theory. The plaintiff Lattanzio testified that "no" other federally recognized agency would complete the accreditation process within 33 months. The defendants were aware of this. Lattanzio testified that the statements made by former defendant director staff and Ostendorf at the workshop induced him into using the defendant's service.

C. The defense's theory that it provided assistance cannot be based on the evidence in this trial. Ostendorf forgot when she hired Fridley and could not remember that Fridley assisted her at the March 2001 workshop. Her recanted testimony shows that Fridley was hired in January 2001. He was then presented in March 2001 as the "accreditation project specialist." He had no accreditation, education or professional background whatsoever in this area. Plaintiff Lattanzio testified that he had over 28 years experience in education and has been involved with federally recognized accreditation since the

mid 80's. Lattanzio also testified that he himself was an onsite visit member for a recognized agency. The Court determined by admission in Court and defendant Ostendorf testimony that defendants were supposed to provide assistance. Goss, who was not present during these disclosures completely, contradicted Ostendorf and defense counsel admission. The Court can also clearly see that within the onsite report there is a "comment" section. If the defendants truly wanted to provide "assistance" they could have placed just "<u>one</u>" positive or suggestive comment as advise or help to Galen. No, all the comments within the report are all negative in nature. The additional theory that the communication from Fridley and/or the phone call from Ostendorf in January was assistance. A reading of the Fridley letter and the evidence is baseless. How could defendants possibly represent that one letter from Fridley (the person with NO experience) be "assistance," when their forty-five page onsite report, supposedly written by experts, contains absolutely nothing in the way of assistance, when there is a comment section provided for such on the report. Furthermore, read the defense theory, "the assistance is to be provided during the six to nine months the school prepares the SSR, however, there is no evidence of any assistance. Defendants further float the theory that Galen refused assistance at every stage, when plaintiff Lattanzio did testify that when Fridley told Galen staff to lie on the SSR. The ultimate fact is that Goss, the CEO and chief commissioner testified "we do not help." The defendants should have to live with that. Who are we to believe, the CEO, Chief commissioner or Carole Ostendorf, the former executive director. In addition, the fax from Galen is self-explanatory and cannot be distorted into another invented policy (if insisted, defendants will conduct a site visit) that cannot be found in the policies and procedures. The

defendants did not provide the service they promised and according to their timetables. It makes absolutely no sense for Galen to "refuse" to follow or comply with defendant's policies or standards. Most if not all of the testimony noted in this section of the defense brief is taken out of context.

D.  The defendants were not qualified. All the testimony from the plaintiff as well as the defendant's show that the defendant's policies and procedures were not followed with respect to providing "qualified" people. In fact, the policies clearly call for and promises "experts." In ALL areas of accreditation. It further calls for the training of these "experts" in many specific ancillary areas, as listed in the "onsite visit process" document. Brenda testified she had not received specific training. In fact when questioned, she hesitated as if she had no clue to what was being asked. Griffith did not even know the forms or appendixes used by the defendants. The defendants failed miserably in this theory. Now as a defense, defendants want the Court to buy their claim that because "presently, Ostendorf is in some management capacity, she therefore was an expert or even qualified in March 2002." Brenda Griffith testified she only had two years or less of teaching exposure in March 2002. She also testified that she has no formal post secondary college education. She has no degrees or teaching certificates. In fact, if one reads the defendants standards for teaching sciences, anatomy, physiology or pathology, Brenda Griffith does not qualify or meet the defendant's own qualifications. Griffith also testified that she did not review the State of Connecticut Department of Higher Education documentation on Galen's authorization. How then could she have followed defendant's policies, when it calls for a comparison of State law to see which applies. She also testified on cross that she was not trained in the areas that defendants

10

policies call for or promise. Brenda Griffith fails any "qualified" or "expert" test that could

be given and so does this defense theory. The other two-onsite members, who were

promised at the beginning of the trial, (we're bringing in people from all over the

country), did not show. The defense claims that they too were experts is clearly not

supported by the onsite report findings compared to the defendants policies and

procedures or standards, which plaintiffs Lattanzio testified repeatedly was in conflict

and contradiction. This "qualified" defense theory is also called into question when Goss

testified that he reviewed the onsite report written by these experts and "found and

changed <u>many</u> of the ratings for the standards." Goss testified that he could only

remember two, but he did testify that there were many changes. Goss did not even visit

Galen, however, he found many changes needed to be made. If Goss found <u>many</u>

wrong or invalid ratings, written by the experts, how accurate was the report. Remember

Goss directly contradicted Ostendorf as to their policies and procedures and standards.

Who trained these experts, Ostendorf testified that she did. One area that the

defendants have intentionally not mentioned is the fact that the "experts" reported that

Galen's financials did not meet defendants standards, even when their standards clearly

call for defendants to "accept as meeting their standard" the financials if approved by

the State of Connecticut, which Galen's' were. My goodness, the evidence shows that

the onsite team had the very person, Brenda Lerner, from the Department of Higher

education whose job it was to approve Galen's financials, which she had since 1999, in

the room with them for an entire day, and they had two letters from Lerner stating that

the financials had been approved. How could they not have verified that. These were

the "eyes" of the defendants. How could De Meux, the so-called financial expert and

Ostendorf her so-called financial expert backup (and with Ostendorf training Meux) have

missed this one. Then we have Goss, the CEO, and chief commissioner. How could he

or the other commissioner have missed it in their review. Another example, Lattanzio

testified that the doors to the building and to Galen were double doors, seven feet wide

and that every door inside was thirty-six inches wide and a scale floor plan was

submitted to defendants, yet Griffith concluded that a wheel chair could not get in. She

concluded this because her husband is confined to one. The onsite team and the

commissioners also failed to read the SSR narrative and apply Goss's policy; If a school

puts it in the SSR how they or how they will meet the standard, that is accecptable.

E. The defendants listed Patricia Santoro from the Connecticut department of Education as

a defense witness. They failed to call Ms. Santoro. This one person could have

dispelled any contention that Connecticut Law did or did not exceeded defendant's

standards in part. According to defendant's own policy, a comparison to State law must

be made before a determination of "meeting" a standard can be made. Defendants did

not do this. The testimony used in this section is also taken out of context. Plaintiff

Lattanzio extensively testified to each standard, rating, and comment then testifies as to

how the misapplication occurred. Within the sections (i) through (xviii) is the defense

rendition of how Galen did not meet the standards. If the Court concludes that the

defendants did not follow their policies, procedures or applies their standards

accordingly then this rehashing in their view is moot. The Court is going to have to

"speculate" to all of this because mostly in part of the defendants testimony, which

contradicted each other over and over concerning the application of those policies and

standards and how to meet them as well. If the process was flawed, any conclusion is

flawed. The very fact that Galen terminated their participation May 21, 2002 and from

that point in time forward provided absolutely no further information to defendants

precludes any claim by defendants past that point of so called opportunities or

administrative remedies. If defendants did not follow their policies in the accreditation

process, no assurance could ever be presented that defendants would have followed

their "appeal" process. The most compelling support to this plaintiffs claim is that if

Galen did not meet any of these standards then why did Goss issue a letter to Galen In

November 2002 stating "with reasonable work" Galen could meet the standards. Then

In April 2003, Goss writes, "Galen cannot meet" the standards without extensive major

work. Remember, Galen did nothing from May 21, 2002 on. The majority of the

testimony used in the defense sections (i) through (xviii) is misquoted and taken out of

context. "After the fact" is too late for the defendants to create any defense based on

these fabricated claims.

F.  Galen must have provided everything that defendants asked for. In order for the

accreditation process to progress, defendant's policies call for step by step approval,

first by defendants themselves, of the responses and information supplied by Galen.

Then and only then can the process continue. The fact that the onsite occurred proves

that Galen met and provided all the information needed. For the defendants to they say

that because of pending lawsuits there was a need to determine what the "exposure" is

just utter nonsense. Who on the onsite team was to make this determination. None of

the so-called experts testified that they had any legal experience or law expertise to

even make such a determination. Prior to the full conclusion of any lawsuit, what valid

determination as to "exposure" can be determined and what kind of "rating" was to be

given. This Court can clearly see how ill prepared these defendants are by these half baked theories.

G. Plaintiffs are not arguing otherwise. Plaintiff's position is that the decision on April 1, 2003 to deny Galen accreditation is invalid, like their process, (according to defendants own policies), regardless if it is made by the "sum of the ratings" on an onsite report or by some commissioner finding faults on said report and changing the ratings. Defendants could have also denied Galen in order to create a defense. Goss did not testify that he "lowered" any rating. Goss testified that he raised ratings, with out even being present at Galen. What would Goss had done, if on the onsite report all the standards were rated 3 or 4 (meeting the standard). What sticks out like a big red flag is that Goss's testimony on meeting the standards severely contradicts Ostendorfs and Griffiths. Goss, the COE, chief commissioner and he also testified that he himself has gone on site visits. This one fact clearly proves that if Goss on an onsite visit has a different understanding of how a standard is met then Ostendorf when she is on a site visit clearly concludes that an arbitrary application of the standards is being committed by defendants. Another compelling fact that defendants can not run away from is that Goss testified that in his review and first letter to Galen from the commission (November 2001), in addition to claiming that with "reasonable work" Galen can meet the standards," he also states that "no second visit" will be required. How could Goss write that "no second visit" was necessary to verify the standards that called for a visit or in class observations in order to verify. Goss also clearly testified that to meet a standard, all that is required is that a school writes in the SSR narrative "how the school will" meet the standard and that "a school can make it hard or easy on themselves." Perhaps Goss

understood the defendant's policies, standards and the concepts much better then did the onsite team. A clear reading of the SSR narrative shows Galen stated, how they met and/or would meet the standards. Clearly meeting Goss's rendition, which is contradicting and opposite to the defense's theory. How is it that the two most highest officials (Goss and Ostendorf) in the accreditation agency are not exactly on the same page and have so diametrically opposed understandings of the agencies policies and procedures and standards and how they're met. Another fact is (there was no testimony given) that the defendants ever supplied Galen with an updated report as to any of the changes supposedly made by Goss. The November deferral letter falls way short of any "assistance" being provided. The defendants never informed Galen that "ratings were raised." When Goss testified that he made many changes to the report would he or Ostendorf have exposed the "failure" of the onsite team to conduct the visit. The defendants created a guessing game for Galen. Galen should have been able to totally rely on the defendants written policies and procedures and standards.

H. Galen withdrew from the process on May 21, 2002, brought a Federal lawsuit against the defendants on July 18, 2002. Past May 21, 2002, Galen was not obligated to continue the process past a formal complaint to defendants, which it clearly made. Defendants failed to follow that policy. Defendants have continued for years to represent that "Galen can not withdraw," "Galen can not withdraw," "Galen can not withdraw," yet Lattanzio testified that (and no one refuted), counsel for AMTA contacted Lattanzio in September 2002 and offered to withdraw Galen, return the application fee and materials if Galen would withdraw the lawsuit. Further evidence that their "policies" can and were arbitrarily made up as they go along. Defendants want this Court to

believe as fact that the onsite team "are the eyes" of the commission. In this case Goss's testimony proves that the onsite team was "blind" to Goss's interpretations of the agencies policies and standards.

I.  Defendants did violate confidential agreement. Defendants in writing promised "strict confidentially" and that "no one will be given any accreditation process information. Brenda Griffith testified that she was given the SSR documents four weeks before she signed any confidential agreement. Griffith could have copied and given this information to anyone. Ostendorf testified that on May 21, 2002 she sent a copy of Galen's "strictly confidential" "onsite report" and Galen's "response" to Patricia Santoro of the Connecticut Department of Higher Education. This transmission was during the accreditation process. The Court can see the volatile "comments" made by defendants in said onsite report. Then, we learn that Goss changed many of the findings. Was an updated report sent to the State to correct the baseless comments. Goss testified that the defendants "do not give any accreditation process information to anyone, including State or Federal agencies." The defendants claim that the State needs this information to conduct their review. The State law in Connecticut calls for the acceptance of accreditation, of a Federally recognized agency, which defendants were not at the time, in lue of State review. This defense theory is worthless. The defendants confuse the State agencies by the use of initials DPH. The Department of Public Health did not need this report, nor did plaintiff disclose it. This is absurd. There is no policy or procedure that states this new invented theory. Even so, where does it state in any of their policies or procedures that the accrediting agency has the right to freely give out information that they themselves titled "strictly confidential" and also claim that "no one" will see this

16

information. Plaintiffs submit that Goss's testimony is correct and the acts of Ostendorf

in transmitting this "preliminary report" information was a clear breach of "strict

confidentially." Yet another violation of the agencies policies and promises.

J.   The defendant's definition of "conflict" is not the same as Blacks. Where did they come

up with a definition out of Blacks. Defense counsel should have read the defendants

"conflict policy" or promises, because it clearly states defendants will avoid even the

"appearance" of a conflict. Plaintiff Lattanzio testified that after the dust had settled,

startling discoveries were made regarding the defendants and his only direct competitor.

Lattanzio testified that his competitor, Steven Kitts was an original founder of the

defendants accrediting agency. Kitts's school director, Linda Derrik, was a

commissioner for the defendants. Now Kitts is a corporate member of defendant's new

corporation. Ostendorf testified that she was in Washington DC, in December 2001

(instead of attempting to meet the Galen deadlines) with Kitts, Derikik and Griffith as

well. Lattanzio also testified that he later found out that Brenda Griffith, who was the

president of the AMTA, authored a secrete strategic plan, calling for the "weeding out"

of schools. How could an association (AMTA) of massage therapists, weed out schools.

It was AMTA who actually owned and operated the "fictitious" accrediting agency. The

defendants admit as a fact that they had "never not" accredited a school. Lattanzio

surmised that Galen targeted as the test school to be "weeded out" by the defendants.

Whatever the actual circumstances were, to the plaintiff's there was certainly

"appearances" of conflicts. Unless intentional, all this could have been avoided if the

defendants would have disclosed these later learned facts up front, to which Galen

would not have used the defendants. At the very least, the selection of other non-hostile

team members to which Ostendorf testified that they had plenty on their list. In addition, Galen's business relationship ended on May 21, 2002 not in 2003. Defendants continued to share, disclose and breach their conflict policy as well as their confidentially agreement.

K.  In one section defendants state that their complaint policy only relates to accredited schools. Here they want it now to apply to Galen as well as they brought the issue up at trial, after Lattanzio testified that he was told during the visit that the Slezinsky letter would not even be considered. Goss testified that defendants have a complaint policy and it is written and posted on their web site. It calls for two specific actions being taken if a complaint regards an accredited school or the agency. Said policy calls for complaints to be in writing. State law also calls for any complaint must be in writing. As stated in the comments section of the onsite report, the defendants referred to "phoned in" complaints reported by the State of Connecticut Department of Education. If the defendants could comprehend their own policy and they read State law, like they now want this Court to believe they did, then how is it they violated or disregarded both their own policy and did not apply State law. According to State law, and defendant's own policies, there is no such thing as a verbal complaint. The defendants should have known it and they should have applied the law. How do we know that Kitts didn't call in complaints or for that matter, Ostendorf or Griffith. The very reason why we make people write and sign complaints is so basic and simple. Furthermore, a reading of the comments in the onsite report has excerpts from the State reports actually word for word regarding verbal complaints, to which did not meet those sections. For the defendants to now claim, there was no evidence presented that verbal complaints were

used by defendants is just not true. If defendants applied their policies, there would be no mention of verbal complaints in the onsite report comments or there would be a disclosure that verbal complaints are in fact not considered a complaint at all, just hearsay.

L.  Telling the truth is at the heart of the matter and the defendants have not told the truth. Defendants did not truthfully disclose who they actually were. The Court early on in the trial exposed the defendants for who they actually were. The Court surmised that: "what we have here is the AMTA conducting business under a fictitious name in Connecticut, not legally registered or certified to do so," to which counsel for defendants replied, "yes your honor." They were in fact the AMTA. The very same AMTA that wants to weed out schools. Plaintiff testified that if he had known this, he would <u>not</u> have used them. In addition, the defendant's policies call for "complete and accurate disclosure," to which Ostendorf testified the defendants are held to the same policies as schools. The failure of defendants to disclose who they really were was a direct and compelling violation of their policies. Their policy states, "a failure to make complete, accurate and truthfully disclosures, is considered a breach of integrity, which invalidates the accreditation process." The defendants also continued this deception throughout this lawsuit, filing an appearance, an answer and motions. It was only after being defaulted did they (AMTA) come forward and admit whom they were. They failed to register the business in this State, which violated their standard that "they must be legally operating." On and on and on...... Defendants promised, "Their process of accreditation assures the highest integrity." Yet the defendants themselves don't follow the law and now claim that it has no bearing on this matter. The organizational structure of defendants has a direct

bearing on the issue of integrity. The "highest Integrity" is what the defendants promised. Concealing who you actually are, operating illegally, not facing up to or acting responsible for your conduct or actions and immediately addressing the Galen complaint is not someone of the highest integrity. The defendants even ignored the F.R.Civ.P. 4, waiver of summons and complaint. Instead, the plaintiff had to chase them down and have them served in hand. The defendants offer absolutely no excuse and should have to pay back the plaintiff for his costs in serving defendants. This is not the conduct of one that claims to be of the highest integrity. These turned out to be worthless promises that the plaintiff relied on and thus contributed to the damages.

M. Galen has suffered extensive damages, losses and costs and has testified to the amounts incurred. Not only the costs of accreditation but the repercussions and ramifications of not having access to Federal financial aid for its students. The ultimate and most devastating loss to Galen was its ability to compete in the market for many years to come. This Court now knows full well the time, costs and extensive disclosure process of accreditation and should consider how Galen will have to explain this mess in any future attempt to seek accreditation from a reputable Federally recognized agency. There is attached to this act a far reaching and costly recovery, if one is even possible. There was absolutely no testimony or evidence from the defendants that refute the above. Once again, the defense theories of no damage or no evidence are absurd. The sheer volume of information and the time it took Galen to compile it would conclude costs. The fact that the whole three-year process fell apart damaged Galen. The fact that the defendants do not want to be accountable or financially responsible for their acts is no defense. A review of the Galen financials (99, 00, 01, 02), within the

SSR and exhibits will show that Galen was growing 300% each year and operating in the black each and every year until 2002 when Galen began suffering extensive losses. Lattanzio testified as to the extensive extra costs of accreditation. Defendants claim that no damages occurred but then want the Court to speculate that the State of Connecticut Department of Education should be responsible for any damages. The Court knows that hiring an attorney is expensive. The Court also knows that for an individual to attempt this complicated process pro se requires much time, which is a cost to a business owner such as Lattanzio.

The plaintiffs have provided enough specific support for a judgment in their favor, the awarding of damages, legal costs and additional punitive damages.

BY,

James Lattanzio, pro se
Plaintiff

This is to certify that a copy of the foregoing Reply was served on the following counsel of record on July 20, 2005:

Douglas M. Connors
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
One Stamford Plaza
263 Tresser Boulevard, Ninth Floor
Stamford, CT 06901

Thoams A Amato
357 E. Center Street
Manchester, CT 06040

James Lattanzio